UNITED STATES of America,
Appellee,

v.

Michael CURTISS, Defendant-Appellant.

No. 193, Docket 28112.

United States Court of Appeals
Second Circuit.

Argued Nov. 20, 1963.

Decided March 31, 1964.

Lewis L. Douglass, Asst. U. S. Atty. (Joseph P. Hoey, U. S. Atty. for Eastern District of New York, on the brief), for appellee.

Lloyd A. Hale, New York City (Louis Bender, New York City, on the brief), for defendant-appellant.

Before MEDINA, WATERMAN and MARSHALL, Circuit Judges.

MARSHALL, Circuit Judge.

Appellant was convicted after a jury trial on his plea of not guilty to a two-

count indictment charging evasion of personal income tax for the years 1955 and 1956, in violation of 26 U.S.C. § 7201. He was sentenced to nine months imprisonment on each count, the sentences to run concurrently. A review of the record in this case convinces us that the totality of error deprived appellant of a fair trial and requires a reversal of the judgment.

Immediately prior to the trial defendant requested a conference which was held in the judge's chambers. He complained that he had been in an automobile accident two months before and was not physically able to go to trial. After a series of questions by the judge as to the details of the accident and the extent of the alleged injuries, he asked Curtiss what he should do. Defendant replied by giving him a written "statement" concerning his efforts to have the Assistant U. S. Attorney agree to accept a plan for payment of the tax deficiencies in lieu of prosecution. To this, the judge explained that there was a difference between civil and criminal responsibilities. The following colloquy then took place:

"The Defendant: I don't feel that I am guilty with intent, I feel I have erred.

"The Court: Well, there is the situation, you have the choice of either procedure, either to plead guilty, if you feel that that meets with your approval, or if you don't think you are guilty, you do what anybody else does in similar circumstances, and put your position before the jury on the trial.

"The Defendant: All right, your Honor.

"The Court: That is what you are at liberty to do. You have a right to have your say in the case, you can take the stand if you see fit and explain your position under the laws of evidence, if it fits in with that, and do what any other defendant does. You are in no different position than any defendant before a Court on a charge.

"The Defendant: The only difference, your Honor, is that I have been through quite an ordeal in the last few months with this, and this coming right on top of it.

"But I have no choice. O.K., I will go along."

From the minutes of the conference it appears that defendant had had three attorneys during the pre-trial period, the last one being Marshall Kaplan who was appointed by the court. The judge stated that Mr. Kaplan had subsequently advised him that defendant did not want him as a lawyer and preferred to act as his own lawyer. However, the judge requested Mr. Kaplan to sit in the court and to be available to defendant for advice.

The trial followed immediately after the conference with the defendant representing himself and Mr. Kaplan seated at the table with him. The Government's case consisted of several exhibits and oral testimony. There was some cross-examination and some objections to exhibits by defendant, all of which were overruled. The defendant did not testify and called only one witness, a man who had previously testified for the Government. At the conclusion of the trial, the judge stated:

"Let the record note the defendant is now conferring with Mr. Kaplan, whom the Court has assigned as a lawyer, and he has conferred with him throughout the trial, which he is entitled to do."

■ Defendant's inept efforts to make an opening statement, to object to offers of evidence, to question and cross-examine witnesses, and to sum up, leave no doubt that he was not adequately represented. Therefore, the sole question on this point is whether he intelligently waived his right to assistance of counsel and knowingly chose to represent himself. While we recognize the difficulties a trial judge faces in situations of this kind, we believe that the right to counsel in a federal criminal trial can only be waived after a clear-cut explanation of

the defendant's rights and an intelligent exercise of the choice.

■ "If the defendant appears in court without counsel, the court shall advise him of his right to counsel and assign counsel to represent him at every stage of the proceeding unless he elects to proceed without counsel or is able to obtain counsel". Fed.R.Crim.P. 44.

Indeed, we must "indulge every reasonable presumption against waiver," and cannot "presume acquiescence in the loss of fundamental rights." Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). See also: Von Moltke v. Gillies, 332 U.S. 708, 68 S.Ct. 316, 92 L.Ed. 309 (1948).

■■ There is nothing in the record to show an explanation of defendant's

right to counsel as set forth in Rule 44,[1] nor is there a clear cut election by defendant. At best, the court relied on a statement by Mr. Kaplan, made some time before the date of the trial, to the effect that Curtiss did not wish to avail himself of his services.[2] Curtiss' statements indicate that while he was unhappy about his relationship with Mr. Kaplan, he certainly had no wish to try the case himself but felt that "he had no choice." Of course the judge need not have appointed other counsel besides Mr. Kaplan unless Curtiss showed good cause, United States v. Gutterman, 147 F.2d 540 (2 Cir. 1945), but it was erroneous to require him to try his own case without a clear cut statement that he intelligently wished to do so.

Even if some doubt exists on the question whether defendant effectively

1. In a case involving defendant's alleged waiver of right to be present during trial, Judge Wright of the Court of Appeals for the District of Columbia stated:

"This means that where the defendant is available, 'the serious and weighty responsibility' of determining whether he wants to waive a constitutional right requires that he be brought before the court, advised of that right, and then permitted to make 'an intelligent and competent waiver.'" Cross v. United States, 325 F.2d 629, 631 (D.C.Cir. 1963).

2. Much of the difference of opinion in this case concerns the interpretation of the colloquy in chambers between the trial judge, Curtiss, and Mr. Kelly, the prosecutor. In the interest of clarity, we set forth the relevant portion of the transcript:

"The Court: It is one of the oldest cases in this court, and you have had a great many different lawyers in the case —I think four or five of them.

"Mr. Kelly: Well, I know of three.

"The Court: Three or four. And apparently you didn't see fit to keep on with any of the lawyers, and it came to a point where we had to proceed for trial. It's been on the calendar any number of times since the filing of the indictment, and finally I think it was last May when there had been so much delay in the case, and most of it because you weren't ready to proceed for trial, that I assigned Mr.

Marshall Kaplan to represent you. And Mr. Kaplan advised me sometime after that that you felt that you didn't want him to act as your lawyer, and you wanted to act as your own lawyer; and under those circumstances I accepted your statement. You have a right to be your own lawyer.

"But just for your protection I have asked Mr. Marshall Kaplan to sit in court and to be available to you should you want any advice from him.

"Now, you have had every opportunity, a great deal more than seems to be the case with other situations. We can't give different treatment to different defendants, we have to follow out the same procedures in all cases.

"But in this case I think we have done a great deal more, and have had a great deal more lapse of time and discussion about these various situations than has been the case heretofore, and we have other situations here in the court, and we just have to proceed normally and come to dispositions of cases.

"The Defendant: Well, your Honor, as far as Mr. Kaplan, I feel very strongly in his favor as far as it being very unfair to have him act at all, I imagine, because I have noticed a form of reluctance on his part. I don't think he means it, but I do feel it as we talk. Then when I do ask him something, he shies away from me, he is reluctant—I don't blame him, I mean I'd feel the same way he does."

waived his right to counsel, the judgment must be reversed because of improper statements made during the government's summation, which take on special significance where, as here, the defendant has acted as his own attorney. During his summation, Curtiss several times sought to explain his business conduct and give excuses for his tax deficiencies. Each time, the judge on objection by the prosecution admonished him to confine his argument to the evidence. The prosecutor, when his turn came to address the jury, made the following comments:

"I say that this man here stands before you and he begs for your sympathy; he is strictly a faker, he is trying to pull the wool over your eyes, and you are not going to let him get away with it.

\* \* \* \* \* \*

"Ladies and gentlemen, I don't see how there could be any mistake whatsoever, and I know that as intelligent jurors you are not going to permit him to stand before you and tell you bold face lies, *not under oath, as the witnesses testified on the chair, each and every one of them were sworn, they testified under oath, but the defendant stood down here and he asked a lot of questions.*" (Emphasis supplied.)

■ Not only were these statements inflammatory and prejudicial to the defendant, but they in effect constituted a comment on his failure to take the stand, which itself is reversible error.

"The Fifth Amendment to the United States Constitution provides in unequivocal terms that no person may 'be compelled in any criminal case to be a witness against himself.' To protect this right Congress has declared that the failure of a defendant to testify in his own defense 'shall not create any presumption against him.' Ordinarily, the effectuation of this protection is a relatively simple matter—if the defendant chooses not to take the stand, no comment or argument about his failure to testify is permitted." Stewart v. United States, 366 U.S. 1, 2, 81 S.Ct. 941, 6 L.Ed. 2d 84 (1961).

■■ Appellant's summation as his own attorney did not constitute a waiver of his Fifth Amendment protection. Nor could it be used as an excuse to disregard the admonition against "comment or argument about his failure to testify." The government contends that defendant's efforts to argue his case in summation with facts outside the record "left the Assistant United States Attorney no alternative except to let these arguments go unanswered or to answer them in his summation." We do not agree. In a case involving unfair tactics of defense counsel, the Fifth Circuit stated:

"We are not impressed with the argument that the conduct of the prosecutor was caused by the conduct of defense counsel. A prosecutor should be immune to improper tactics. If he feels that his opponent has overstepped, the remedy is an appeal to the trial court—not in the adoption of unfair procedures." Dugan Drug Stores, Inc. v. United States, 326 F.2d 835, 837 (1964).

■ When appellant argued outside the record, every objection by the prosecution was sustained with clear rulings by the judge that argument outside the record was not permitted and the jury was adequately charged on that point. The fullest protection was available to the prosecution. The cases cited by the government concerning arguments of counsel in reply to arguments of opposing counsel do not support the above comment on the failure of the defendant to take the witness stand. This cannot be viewed as harmless error. Stewart v. United States, 366 U.S. 1, 81 S.Ct. 941, 6 L.Ed.2d 84 (1961); Bruno v. United States, 308 U.S. 287, 60 S.Ct. 198, 84 L. Ed. 257 (1939); White v. United States, 114 U.S.App.D.C. 238, 314 F.2d 243 (D. C.Cir. 1962). Cf. Kyle v. United States, 297 F.2d 507 (2 Cir. 1961). This right is to be protected regardless of the crime

charged or the weight of the evidence supporting the charge.

The judgment is reversed, and the cause remanded for a new trial.

MEDINA, Circuit Judge (dissenting).

My brothers of the majority would set aside the judgment of conviction and grant a new trial because: (1) it is said the record contains nothing to show "a clear explanation" by Judge Bruchhausen to Curtiss of his right to have counsel assigned to defend him, "nor is there a clear-cut election" by Curtiss to conduct his defense *pro se*; and (2) certain comments by the prosecutor in his summation were "inflammatory and prejudicial," and deprived Curtiss of his Fifth Amendment rights. The reference in the majority opinion to "the totality of error" comprises only the two matters just set forth, neither of which was in any way brought to the attention of Judge Bruchhausen at the trial. As a matter of fact, the case is an exceedingly simple one, there was no defense other than the unsworn protestations of Curtiss in his summation *pro se* that he was guilty but "not wilfully, not with intent," and the record as I view it discloses no error whatever.

I

With all due respect for my brothers I must say at the outset that I cannot agree that "[m]uch of the difference of opinion in this case concerns the interpretation of the colloquy in chambers" quoted in footnote 1 in the majority opinion. On the facts of the case, we are as far apart as the poles.

The substance of the holding of the majority is that the waiver of his right to assigned counsel and the election to defend *pro se*, if any, took place in the judge's chambers on the day of trial, and that the colloquy on that occasion failed to show any "clear-cut explanation" by Judge Bruchhausen of Curtiss' right to assigned counsel or anything else to indicate that Curtiss made an intelligent choice between the two alternatives of lawyer or no lawyer. Indeed, and quoting from the same colloquy in the robing room, it is said in the majority opinion that the statement by Curtiss that "he had no choice" indicated that he had no real desire to act *pro se* but did so only because he thought "he had no choice."

What I say is that in his opening to the jury Curtiss admitted he had elected to conduct his own defense. The word "elected" is his own. The record reads:

"And the only reason that I am taking and have elected to handle my case—well, let me take that back, Ladies and Gentlemen of the jury and your Honor—two reasons. The most important reason was I have a strong feeling spiritually in God's way—

"Mr. Kelly: Judge, most reluctantly, I am going to object now to this opening.

"The Court: Yes, I will have to inform you, Mr. Curtiss, that at this time you should restrict your remarks to what you intend to prove."

This "clear-cut" statement can have no meaning other than that Curtiss knew he had a choice between having a lawyer assigned by the Court or conducting and managing his own defense *pro se,* and that he had made the choice intelligently and with his eyes open. I also say this election, which necessarily includes the waiver of a right to assigned counsel, was made, not during the colloquy in chambers on the day of the trial, but many weeks before. There is enough in this record to demonstrate that in the course of the numerous appearances before Judge Bruchhausen, prior to the day of trial, lawyers were assigned to defend Curtiss and, in the withdrawal of some and the relief of at least one other, it must have been plain to Curtiss that Judge Bruchhausen felt under an obligation to assign counsel unless Curtiss decided of his own free will to conduct his own defense. It is in the statements by Judge Bruchhausen, by the prosecutor and especially by Curtiss himself that the colloquy in chambers becomes important, as these statements *referred to what had already taken place in the past.*

I also say, alternatively, that if there could possibly be any doubt on the subject of the substance of what was said by Judge Bruchhausen or by other judges and by Curtiss *on these prior occasions* relative to his right to elect between having a lawyer assigned or to act *pro se,* we should retain jurisdiction over the appeal from the judgment and remand the case to Judge Bruchhausen for a reconstruction of the record of what took place *on these prior occasions.* Perhaps a transcript or at least the original notes of the Court Reporter may be available, although no transcript is before us now. If no such transcript or notes are in existence, a hearing could be held for the purpose of giving Judge Bruchhausen an opportunity to reconstruct the record.

Just prior to the commencement of the trial on November 8, 1962 there was a conference in the chambers of Judge Bruchhausen. We have before us a 19 page transcript of what was said. It is first to be observed that the Court Reporter had already noted the appearances, including "Michael Curtiss, Defendant *Pro Se.*" This indicates to me that, prior to any colloquy in chambers, Curtiss had informed the Court Reporter that he would manage and conduct his own defense. As the conference was at the request of Curtiss, Judge Bruchhausen asked him to proceed. Pages 2–10 are devoted to what appears to be a request for another postponement of the trial because Curtiss had been in an automobile accident "the last couple of months." Then Judge Bruchhausen asked Curtiss what he wanted him to do, and Curtiss read a written statement to the effect that he had tried to settle the matter, but the prosecutor had rejected his offer. Then followed pages 10–14, Curtiss pleading for compromise and Judge Bruchhausen explaining the difference between "civil liability" and "criminal liability." This led up to the statement "I have no choice," which the majority construes to mean that Curtiss "certainly had no wish to try the case himself but felt 'he had no choice.'" When read in context in the following

quotation from pages 13–14 of the colloquy in chambers, it is perfectly plain to me that Curtiss was going ahead with the trial because he had no choice. The remark has nothing whatever to do with the subject of whether Curtiss was to have a lawyer or to defend himself. The transcript reads:

"The Defendant: I don't feel that I am guilty with intent, I feel I have erred.

"The Court: Well, there is the situation, you have the choice of either procedure, either to plead guilty, if you feel that that meets with your approval, or if you don't think you are guilty, you do what anybody else does in similar circumstances, and put your position before the jury on the trial.

"The Defendant: All right, your Honor.

"The Court: That is what you are at liberty to do. You have a right to have your say in the case, you can take the stand if you see fit and explain your position under the laws of evidence, if it fits in with that, and do what any other defendant does. You are in no different position than any defendant before a Court on a charge.

"The Defendant: The only difference, your Honor, is that I have been through quite an ordeal in the last few months with this, and this coming right on top of it.

"But I have no choice. O. K., I will go along."

I find nothing in the colloquy in chambers or in the record as a whole to support the strong intimation in the majority opinion that Curtiss was acting as his own lawyer against his will, or even reluctantly, and without understanding or realizing that the Court would assign a lawyer to defend him if he so desired. Indeed, the facts are just to the contrary.

After Curtiss became convinced that he would not succeed in putting off the

trial and that he had no choice but to go ahead, Judge Bruchhausen referred to the fact that this was one of the oldest cases on the docket of the Eastern District of New York, and this led to some discussion on the subject of the number of lawyers who had already been assigned to defend Curtiss. There was a Mr. Wales assigned. Curtiss did not deny that Mr. Wales had asked to be relieved, nor did he deny Judge Bruchhausen's statement, in the colloquy in chambers, that the matter had come before him and Mr. Wales had said to Judge Bruchhausen, in the presence of Curtiss, that Curtiss did not cooperate with him. Mr. Marshall Kaplan had also been assigned and the circumstances under which he withdrew are described as follows by Judge Bruchhausen, in the same colloquy:

> "The Court: Three or four. And apparently you didn't see fit to keep on with any of the lawyers, and it came to a point where we had to proceed for trial. It's been on the calendar any number of times since the filing of the indictment, and finally I think it was last May when there had been so much delay in the case, and most of it because you weren't ready to proceed for trial, that I assigned Mr. Marshall Kaplan to represent you. And Mr. Kaplan advised me sometime after that that you felt that you didn't want him to act as your lawyer, and you wanted to act as your own lawyer; and under those circumstances I accepted your statement. You have a right to be your own lawyer."

Curtiss did not deny any of these statements by the Court. How this can mean anything other than that Curtiss, with full knowledge of his right to assigned counsel, had elected *long prior to the trial* to manage and conduct his own defense, is a mystery to me. Moreover, his conduct at the trial, discussed below, as well as his admission that he had "elected to handle" his case, indicate not only that Curtiss made the choice deliberately and with his eyes open, but also that he made this decision with the design to trying to do as counsel *pro se* what he knew no lawyer would dare to do, that is to say, make repeated statements of fact that were wholly unsupported by any sworn testimony.

The upshot of the colloquy in chambers on the day of trial was that Judge Bruchhausen said:

> "But just for your protection I have asked Mr. Marshall Kaplan to sit in court and to be available to you should you want any advice from him."

Curtiss made no objection to this. Indeed, he appeared to have welcomed the suggestion, as Mr. Kaplan sat beside Curtiss during the entire trial and conferred with him from time to time. But he was not assigned counsel.[1] Curtiss conducted the defense *pro se*. I am at a loss to understand the meaning of the statement in the majority opinion that the efforts of Curtiss to conduct his defense "leave no doubt that he was not adequately represented." Nor were his efforts "inept." As will appear shortly, he did his best to cajole the jury into a verdict of not guilty in a case in which there was no defense and in which he had already done everything short of pleading guilty.

So I conclude that Curtiss, an intelligent and articulate person, thoroughly understood his right to have counsel assigned to defend him, and he also knew that Judge Bruchhausen thought he ought to have a lawyer to defend him. It was Curtiss who decided with his eyes open and with full knowledge of his rights, not to have a lawyer and to manage and conduct his defense *pro se*. He knew what a lawyer was supposed to do and what it meant to act as his own law-

---

1. While Judge Bruchhausen did say, at the conclusion of the trial, as quoted in the majority opinion, that Curtiss was conferring with Mr. Kaplan, "whom the Court has assigned as a lawyer," it is clear that Mr. Kaplan was only there to give such legal advice as Curtiss might ask him to give. He was not assigned counsel in the ordinary sense and was not conducting and managing the defense.

yer. If under these circumstances Judge Bruchhausen had refused to permit Curtiss to defend *pro se,* this would indeed have been reversible error. See Fed.R. Crim.P. 44; Price v. Johnston, 1948, 334 U.S. 266, 285, 68 S.Ct. 1049, 92 L.Ed. 1356; Adams v. United States ex rel. McCann, 1942, 317 U.S. 269, 279, 63 S. Ct. 236, 87 L.Ed. 268.

## II

The proofs disclosed the following scheme of tax evasion. Curtiss was an independent seller of home improvement contracts. The actual work was done by several contractors, St. George Building Corporation, International Homes, Lehigh Sales and Service Corporation, and a series of separate companies owned by a man named Source. Curtiss went from door to door and got orders for miscellaneous home improvements. These orders matured into contracts signed by the homeowners and St. George Building Corporation, International Homes, Lehigh Sales and Service Corporation, or one of Source's companies. The compensation of Curtiss was the difference between the contract price agreed to be paid by the homeowner and the cost to the contractor plus a reasonable profit to be fixed by the contractor. The result was a series of checks representing the payments to Curtiss. These payments constituted his income and, with the exception of at least some earnings under an assumed name, the aggregate of these payments in the years 1955 and 1956 were reported by the contractors to the Government on the regular Form 1099. The receipt of the major part of this income was proved by the checks themselves and by certain books and records that were received in evidence. The result was that the 1955 return showed a taxable income of $38.32, whereas, according to expert testimony based on previous oral testimony and the exhibits in evidence, it should have been $14,687; and the 1956 return showed a taxable income of $27, whereas, according to the expert testimony, it should have been $5,417.50. In terms of tax due, the 1955 return stated the income tax payable to be $7.66, and the 1956 return stated the tax payable to be $5.40. The Government computation showed tax deficiencies for 1955 and 1956 aggregating $4,624.-89.

In view of the questions formulated by Curtiss and his statements in summation as his own attorney, to which reference will be made shortly, the matter of particular interest and relevancy is the means adopted by Curtiss to defraud the Government. He made out his returns himself. Instead of entering the payments received, which in fact constituted his gross taxable income, he used the printed matter appearing on the returns in such a manner as to make it appear that he was an independent contractor. Thus in the 1955 and 1956 returns the following items appeared:

|  | 1955 | 1956 |
|---|---|---|
| Total receipts less allowances, rebates and returns | $23,440.00 | $20,704.00 |
| Cost of goods sold | 17,580.00 | 15,528.00 |
| Gross profit | 5,860.00 | 5,176.00 |
| Business expenses | 2,042.00 | 1,918.00 |
| Net profit | 3,818.00 | 3,258.00 |
| Itemized deductions | 779.68 | 231.00 |
| Exemptions | 3,000.00 | 3,000.00 |
| Taxable income | 38.32 | 27.00 |
| Tax | 7.66 | 5.40 |

The figures representing total receipts and gross profits appear to have been pulled out of the air. They were, as he indicated in the matter included in some of his questions put to the revenue agents, "estimates."

When he received copies of the Information Returns on Form 1099, he went around to the contractors and induced them to cut them down, although they were originally accurate. For example, the figure for 1955 in the original Form 1099 was $15,588. Curtis got this reduced to $4,960, supplying the new figure himself.

In addition it was proved that he conducted part of his activities with the contractors using the fictitious name of M. Caron, which he insisted at the trial should have been spelled Caran.

The way Curtiss actually conducted his business and the way he prepared the returns was proved by testimony of one of the Internal Revenue Agents who interviewed him on several occasions during the course of the investigation that led to the indictment.

What Curtiss did as his own attorney to give the jury the impression that he never actually intended to defraud the Government, without subjecting himself to cross-examination and to the penalties for perjury, is what led to the remarks of the prosecutor in his summation that my brothers characterize as "inflammatory and prejudicial" and as infringing Curtiss' rights under the Fifth Amendment.

Throughout the trial Curtiss, cross-examining witnesses as his own lawyer, continually put material in the questions to give the impression of honest mistake rather than fraudulent evasion. By "didn't I say this," and "didn't I say that," in questions addressed to Revenue Agents testifying for the prosecution, he sought to make it appear that the amounts stated in the returns were not intended to be "true and accurate," and that he made "estimates" because he could "not get true figures from the peo-

ple who I was with." From time to time he interjected comments, such as "I am trying to show, Your Honor, that it isn't so, what the gentleman is saying." Later he became bolder and in his questions included statements that it was a general practice "for men like myself" to be "credited" with money but not actually receive it, and that the type of men who worked with him were difficult to locate and to get receipts from to show expenses. All this, of course, without a shred of sworn testimony to the effect that he had canvassers working for him or that he paid them anything. Indeed, at the close of the prosecution's case he merely recalled one of the Government's witnesses and rested without taking the stand in his own defense.

In his summation Curtiss had the opportunity he had been looking forward to. Gentle hints by the trial judge to the effect that he should confine himself to the evidence were brushed aside without ceremony.[2] He said all the things he might have testified to had he chosen to call himself as a witness. He explained the nature of his business, the incurring of expenses, his own peculiar "habits and traits from my young years," how his time schedule was so "disordered and disarranged" that it was difficult to keep records, and how he got the figures he put in the returns. He told the jury he had no money to hire an accountant and had a hard time obtaining enough money to live on. After many more statements of this general character, none of which was supported by any sworn testimony, he concluded:

"The only thing that I know here to state is that I know I made these —I am guilty of these errors, I know I am guilty of all these things, but not wilfully, not with intent."

There was no sworn evidence or other proof to support any of these statements. Occasionally the prosecutor objected and Judge Bruchhausen admonished Curtiss to confine himself to the evidence, but Curtiss paid only lip service to these instructions and went right ahead doing the very thing he was admonished not to do.

2. In the majority opinion it is stated with reference to the statements of fact in the summation by Curtiss: "Each time, the judge on objection by the prosecution admonished him to confine his argument to the evidence." I suggest that the whole summation was a series of factual statements to which Curtiss might have testified under oath had he chosen to do so.

Needless to say, he said nothing about procuring the false and inaccurate Information Returns, or the use of a false name.

When his turn came the prosecutor outlined the proofs, giving chapter and verse. He said Curtiss "is strictly a faker, he is trying to pull the wool over your eyes." After summarizing the overwhelming proof of fraudulent intent, the prosecutor made the following statement that is supposed to be "inflammatory and prejudicial" and an infringement of Curtiss' rights under the Fifth Amendment:

> "Ladies and gentlemen, I don't see how there could be any mistake whatsoever, and I know that as intelligent jurors you are not going to permit him to stand before you and tell you bold-faced lies, not under oath, as the witnesses testified on the chair, each and every one of them were sworn, they testified under oath, but the defendant stood down here and he asked a lot of questions. The questions were denied by the witnesses, and you have to remember that questions are not evidence. Anything the defendant said from down here was not evidence, the same as what I am telling you now is not evidence."

No objection was made to this statement by the prosecutor, no request for an instruction to the jury to disregard it, and no motion for a mistrial.

I fail to understand what there is about the prosecutor's summation that was either "inflammatory" or "prejudicial." [3] Certainly it cannot be "inflammatory" to call defense witnesses "bold-faced liars." And if it is proper to call defense witnesses "bold-faced liars," I do not see how it can be wrong to use the same epithet with reference to a defendant who under the guise of being a lawyer *pro se*, keeps making statements throughout the trial that are "bold-faced lies." Perhaps we have arrived at a point where a defendant *pro se* can make any number of false and irresponsible statements, while the prosecutor must restrict himself to innocuous innuendoes. But I do not think we have reached such a point.

I am equally at a loss to see any infringement of appellant's rights under the Fifth Amendment. See Smith v. United States, 5 Cir., 1956, 234 F.2d 385, 388–389; United States v. Redfield, D.C.D.Nev., 1961, 197 F.Supp. 559, 575–578, affirmed, 9 Cir., 295 F.2d 249, cert. denied, 1962, 369 U.S. 803, 82 S.Ct. 642, 7 L.Ed.2d 550. All the prosecutor did was to advert to the fact that Curtiss was relying on his own statements, made in the course of so-called "argument," while the real evidence in the case was given by the witnesses who testified under oath. See Baker v. United States, 8 Cir., 1940, 115 F.2d 533, 543–544, cert. denied, 325 U.S. 894, 65 S.Ct. 1399, 89 L.Ed. 2005. These statements were not evidence, as the trial judge later instructed the jury, without objection, and the reason they were not evidence was that they were not testified to under oath. We have come to a pretty pass if, acting as his own lawyer, a defendant in a criminal case can go ahead and say as a lawyer the things he could have testified to in his own defense, and then accuse the prosecutor of violating his Fifth Amendment rights when the prosecutor tells the jury not to believe him, but rather to render their verdict on the testimony given under oath by the witnesses who did testify.

I would affirm the judgment appealed from.

---

3. This case is quite different from Dugan Drug Stores, Inc. v. United States, 5 Cir., 1964, 326 F.2d 835, in which the prosecutor's aggravated and persistent misconduct related to the accosting of witnesses, implied threats to witnesses, remarks in the presence of the jury relating to matters which occurred out of the presence of the jury, prejudicial statements in colloquies between counsel and between court and counsel, and improper closing argument which went outside the record and made groundless charges and unreasonable inferences.