THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. JOHN FIORAVANTI, DEFENDANT-APPELLANT.

Argued September 13, 1965—Decided December 6, 1965.

112

Mr. *Paul L. Blenden* argued the cause for appellant (*Messrs. Paul L. Blenden* and *Charles Frankel,* attorneys).

Mr. *Thomas L. Yaccarino,* Assistant Prosecutor, argued the cause for respondent (*Mr. Vincent P. Keuper,* Monmouth County Prosecutor, attorney).

The opinion of the court was delivered by

WEINTRAUB, C. J. On the night of July 19–20, 1962 the premises of Abbott's Dairy on Old Mill Road in Wall Township, New Jersey, were broken into and substantial amounts of money and checks were taken from a safe. Two men were indicted on six counts. One of them, Angelo Belardo, pleaded guilty. The other, John Fioravanti, stood trial and was convicted on all counts. We certified Fioravanti's appeal before the Appellate Division acted upon it.

Both Fioravanti and Belardo lived in the Trenton area. The crimes occurred in Monmouth County, some 45 miles away.

Fioravanti's Cadillac convertible was one of several automobiles kept under surveillance that night by the police of Wall Township, Neptune Township, Neptune City, and Asbury Park for reasons not disclosed in the record. Eventually Fioravanti's car was parked behind the Royal Manor restaurant. At about 11:00 P. M. the police observed its two oc-

cupants leave the car and walk along Route 35 and then down Old Mill Road in the direction of Abbott's Dairy. The officers kept their watch of the vehicle until they were replaced by others, who at about 1:00 A. M. saw two men come through a field toward the Fioravanti car, each carrying a bundle. The men stopped short of the car and one, after giving his bundle to the other, went to the car and then drove to and picked up his waiting confederate.

The police followed the car, but it reversed its course after some 100 yards. Being out of position to continue the surveillance, the officers radioed a request that another car take it up. The officers then turned into Old Mill Road, and finding the dairy plant had been entered and its safe forced, they radioed this information and asked that the occupants of the Fioravanti car be picked up. They were apprehended and the bundles seized. The bundles contained burglar tools and the loot.

Belardo testified for the defense. He admitted his guilt, but said he alone was involved. He said he had hidden the burglar tools in a field near the dairy a couple of days before the crime; that on the night in question he left Fioravanti at a motel at about 11:00 P. M.; that at about 1:00 A. M., after he had completed the job at the dairy, he went to the parking lot of the Royal Manor and placed the tools on the front floorboard of Fioravanti's automobile; that, carrying the bag containing the stolen property, he started along the road toward a food stand when Fioravanti, without prearrangement and unaware of any of this, came along and picked him up. He agreed the two bundles were in the front of the car at the time of the arrest and that Fioravanti was the driver.

As already noted, there was direct testimony that two men, rather than one as Belardo claimed, were involved. There was also direct testimony that both Belardo and Fioravanti were at the dairy earlier that day on the pretext, as the State claimed, that they were looking for work. Belardo admitted they had been there, and that he looked around while Fioravanti inquired in the office as to employment prospects, but

Belardo insisted Fioravanti really wanted employment. Further, a police officer identified Fioravanti as one of the two men who left the automobile and walked into Old Mill Road at about 11:00 P.M., and Fioravanti admittedly was driving the car at the time of apprehension. Finally the State introduced testimony that on the trousers the police took from Fioravanti were telltale bits of paint and safe lining which matched control samples taken from the safe which had been forced. Belardo, however, testified the trousers were his.

The defense also offered the testimony of two women from Trenton, friends of Fioravanti, who said they drove to the shore area to meet him at the Royal Manor; that by chance they saw him standing near a motel; that they took him in their car to a bar and eventually dropped him off at the Royal Manor restaurant at about 1:00 A.M. A third woman, also from Trenton, said she too was at the bar with defendant during that period, which, of course, was the period in which, according to the State's evidence, the burglary occurred.

The State's case was very strong and the defense testimony was rather patently contrived. Fioravanti did not take the stand, but at the conclusion of the testimony of the last defense witness, his counsel asked for an opportunity to have Fioravanti try on the trousers which the police said were taken from him. Fioravanti was permitted to do so and to walk before the jury. On the basis of that demonstration the defense argued the trousers could not have been Fioravanti's but rather belonged to Belardo, who, according to the testimony, was taller and heavier than Fioravanti. In this connection we note the case was tried on March 23 and 24, 1964, almost two years after the date of the crime.

## I.

The first, and troublesome, issue is whether the conviction should be set aside because of the trial court's comment upon the failure of the defendant to take the stand. The case was tried prior to *Malloy v. Hogan*, 378 *U. S.* 1, 84 *S. Ct.* 1489,

12 *L. Ed. 2d* 653 (1964), which held the Fifth Amendment applicable to the states, and *Griffin v. State of California,* 380 *U. S.* 609, 85 *S. Ct.* 1229, 14 *L. Ed. 2d* 106 (1965), which thereafter held the Fifth Amendment barred comment upon a defendant's failure to testify. In the present case the trial court charged, in harmony with our decision in *State v. Corby,* 28 *N. J.* 106, 117 (1958), and *N. J. S.* 2A:84A–17(4), that

"* * * His failure to be a witness in his own behalf raises no presumption of guilt nor does it erase the presumption of innocence. But if facts are testified to which tend to inculpate the defendant, which facts he could by his oath deny, his failure to testify in his own behalf may be considered by you and you may infer that he could not truthfully deny the inculpatory facts adduced against him."

After *Malloy* and *Griffin* we held that although the *Corby* type instruction does not authorize an inference of "guilt," nonetheless *Griffin* must be read to strike down a comment which permits an inference that a defendant cannot deny inculpatory facts he could meet by his own oath. *State v. Lanzo,* 44 *N. J.* 560 (1965); *State v. Aviles,* 45 *N. J.* 152 (1965); *State v. Davis,* 45 *N. J.* 195 (1965).

We also held in *Lanzo* that on a direct appeal from a judgment of conviction we would give to defendants tried before *Malloy* the benefit of the new doctrine even though the issue was not raised at the trial. But we have declined to permit a defendant to say that had the new doctrine been then in effect he might have tried his case in a different way and hence there should be a reversal to permit him to make a new tactical decision in the new light. *State v. Garvin,* 44 *N. J.* 268 (1965). And so here, while we accord Fioravanti the benefit of the new constitutional doctrine even though he made no objection at the trial, we apply the doctrine to the case as it was tried rather than upon a speculation as to how he might have gone about his defense if he knew then what he knows now.

Thus we come to the State's contention that the trial court's comment was warranted because the defendant, as we noted above, chose to put on the trousers and walk in front

of the jurors to persuade them the trousers were not taken from him despite the categorical testimony of the police officer that they were. Implicit was not only an assertion the trousers were not his but also, in support thereof, that the measurement of his waist had not changed in the considerable interval between the date of the crime and the date of the trial.

In *Caminetti v. United States*, 242 *U. S.* 470, 37 *S. Ct.* 192, 61 *L. Ed.* 442, (1917), the defendant took the stand and met part of the government's testimony. The trial court informed the jury the defendant could not be compelled to say more, nor could he be cross-examined as to matters not covered by his direct testimony, but he having elected to testify, then "if he has failed to deny or explain acts of an incriminating nature that the evidence of the prosecution tends to establish against him, such failure may not only be commented upon, but may be considered by the jury with all the other circumstances in reaching their conclusion as to his guilt or innocence; since it is a legitimate inference that, could he have truthfully denied or explained the incriminating evidence against him, he would have done so." 242 *U. S.*, at *p.* 493, 37 *S. Ct.*, at *p.* 197, 61 *L. Ed.*, at *p.* 456. This comment is no different from the *Corby* comment made in the case before us. The Court upheld the instruction saying (242 *U. S.*, at *pp.* 493–495, 37 *S. Ct.*, at *p.* 198, 61 *L. Ed.*, at *pp.* 456–457) :

"This instruction, it is contended, was error in that it permitted the jury to draw inferences against the accused from failure to explain incriminating circumstances when it was within his power to do so, and thus operated to his prejudice and virtually made him a witness against himself, in derogation of rights secured by the 5th Amendment to the Federal Constitution.

There is a difference of opinion expressed in the cases upon this subject, the circuit court of appeals in the eighth circuit holding a contrary view, as also did the circuit court of appeals in the first circuit. See Balliet v. United States, 64 C. C. A. 201, 129 Fed. 689; Myrick v. United States, 134 C. C. A. 619, 219 Fed. 1. We think the better reasoning supports the view sustained in the court of appeals in this case, which is that where the accused takes the stand in his own behalf and voluntarily testifies for himself (Act of March 16, 1878, 20 Stat. at L. 30, chap. 37, Comp. Stat. 1913, § 1465), he may

not stop short in his testimony by omitting and failing to explain incriminating circumstances and events already in evidence, in which he participated and concerning which he is fully informed, without subjecting his silence to the inferences to be naturally drawn from it.

The accused, of all persons, had it within his power to meet, by his own account of the facts, the incriminating testimony of the girls. When he took the witness stand in his own behalf he voluntarily relinquished his privilege of silence, and ought not to be heard to speak alone of those things deemed to be for his interest, and be silent where he or his counsel regarded it for his interest to remain so, without the fair inference which would naturally spring from his speaking only of those things which would exculpate him and refraining to speak upon matters within his knowledge which might incriminate him. * * *

The court did not put upon the defendant the burden of explaining every inculpatory fact shown or claimed to be established by the prosecution. The inference was to be drawn from the failure of the accused to meet evidence as to these matters within his own knowledge and as to events in which he was an active participant and fully able to speak when he voluntarily took the stand in his own behalf. We agree with the circuit court of appeals that it was the privilege of the trial court to call the attention of the jury in such manner as it did to this omission of the accused when he took the stand in his own behalf."

The holding of *Caminetti* was reiterated in *Raffel v. United States*, 271 *U. S.* 494, 46 *S. Ct.* 566, 70 *L. Ed.* 1054 (1926), and seems not to have been questioned at any time. Its validity was accepted in *Johnson v. United States*, 318 *U. S.* 189, 196, 63 *S. Ct.* 549, 87 *L. Ed.* 704, 711 (1943). See also *Dyson v. United States*, 283 *F. 2d* 636, 637 (9 *Cir.* 1960), *cert.* denied 366 *U. S.* 974, 81 *S. Ct.* 1944, 6 *L. Ed. 2d* 1264 (1961); *Carpenter v. United States*, 264 *F. 2d* 565, 569–570 (4 *Cir.*), *cert.* denied 360 *U. S.* 936, 79 *S. Ct.* 1459, 3 *L. Ed. 2d* 1548 (1959); *Krotkiewicz v. United States*, 19 *F. 2d* 421, 424–425 (6 *Cir.* 1927); *Grantello v. United States*, 3 *F. 2d* 117, 121 (8 *Cir.* 1924). Cases elsewhere agree with this view. 8 *Wigmore, Evidence (McNaughton rev.* 1961), § 2273(4), *p.* 451; *People v. Clapper*, 43 *Cal. Rptr.* 105, 107 (*D. Ct. App.* 1965); *cf. Uniform Rules of Evidence* 25(g) and 37.

▪ Thus a defendant who undertakes to answer part of the evidence against him is subject to comment as to factual thrusts he does not meet, even though he cannot be ordered

on cross-examination to testify with respect to them. In the basic debate concerning whether an inference should be permitted from a failure to testify, it is argued on the one side that the inference is natural that a defendant who fails to speak in the very forum of the trial itself probably cannot truthfully meet evidence which it is within his ability to deny, and indeed that the inference is so inescapable that words cannot guard against it. On the other hand, it is argued that to permit any inference whatever may press defendants to testify and to risk giving incriminating testimony in the process. In this connection it is noted that an accused may conceivably refrain from testifying for reasons unrelated to the truth of the charge.[1] In resolving that basic dispute the Supreme Court found in favor of the defendant. But when a defendant chooses to speak as to only a part of the direct proof against him, the inference becomes clearer that he is unable to dispute the balance. More importantly he may thereby gather an advantage that is false, for less than the whole truth may affirmatively mislead. 8 *Wigmore, Evidence (McNaughton rev.* 1961), § 2276(2), *pp.* 459–460; *cf. State v. DeCola,* 33 *N. J.* 335, 345 (1960). It would distort the truth-finding process to expect the jurors to weigh what the defendant chooses to reveal and to be oblivious of his silence as to the remainder.

Hence *Caminetti* and the other cited authorities hold that if a defendant does speak in part, his omission to speak as to other direct evidence may be found to be meaningful, and this, not because he "waived" a privilege in the sense that he intentionally incurred a known consequence, but rather because it is sensible and just to permit an inference that a man

---

[1] *Quaere* whether this is an additional basis for the view that the Constitution prohibits comment or whether it is merely an incidental observation that the rule against comment really deprives the State of something which has little probative value. This *quaere* may bear upon the question whether *Malloy* and *Griffin* apply to judgments which were beyond direct review at the time of those decisions. We express no view as to the precise role this consideration has in the constitutional doctrine.

who reveals only part of what he knows with respect to the direct proof against him could not truthfully meet the rest.

The State argues the situation before us does not differ in any realistic way from the one in *Caminetti*, for although there the defendant testified verbally, here Fioravanti testified just as effectively by his demonstration before the jury, the only difference being that Fioravanti chose a technique whereby he succeeded in avoiding cross-examination while in *Caminetti* the defendant could not escape such examination with respect to the content of what he did say.

No doubt one can communicate by gesture as effectively as by word. 3 *Wigmore, Evidence* (*3d ed.* 1940), § 789, *p.* 172. Fioravanti could have testified his girth now is what it was the night of his arrest, the trousers do not fit, and they were not taken from him. Had he so testified, the situation would have been literally and squarely within *Caminetti*. Yet his demonstration before the jury was plainly intended to say as much. Perhaps the State could have resisted the demonstration unless supported by Fioravanti's testimony under oath that his configuration had not changed in the considerable period that had intervened. But whether the State should have so insisted seems to us not to be a point Fioravanti can press, for he chose to communicate with the jury and he succeeded, albeit by their verdict they disbelieved him.

In contending his conduct was not "testimonial" defendant refers to *State v. King*, 44 *N. J.* 346, 357–358 (1965), and *State v. Blair*, 45 *N. J.* 43 (1965), where we reiterated the settled view that an accused may be placed in a lineup, or examined for bodily characteristics, or fingerprinted, or photographed or subjected to comparable procedures without violating his privilege of silence under the Fifth Amendment. In such cases the Amendment does not apply because he is not compelled to say anything he knows or to vouch for the conclusion the State may assert. *Holt v. United States*, 218 *U. S.* 245, 252–253, 31 *S. Ct.* 2, 54 *L. Ed.* 1021, 1030 (1910); 8 *Wigmore, Evidence* (*McNaughton rev.* 1961), § 2265, *p.* 386. So, if the prosecution calls upon a defendant to try on

a garment, the defendant who complies says nothing. He does not assert the garment is his or that it is not. But when a defendant himself undertakes a demonstration which is intended to refute a part of the State's evidence, he may go beyond being a mere neutral, inert subject of a comparison and become the communicant of a testimonial claim. So here, while a police officer testified he took the trousers from Fioravanti, Fioravanti by his demonstration said this was not true; that the trousers were not his; and that the falsity of the officer's testimony is demonstrated by the fact that the trousers obviously do not fit notwithstanding that defendant's weight at trial is the same as it was at the time of the arrest. All of this was necessary for the point defendant sought to make by his nonverbal communication. Without his assertion with respect to an inherent variable, a subject within his own control, *i.e.*, his weight, the demonstration could mean nothing.

The State is supported by *State v. Mayer*, 154 *Wash.* 667, 283 *P.* 195 (*Sup. Ct.* 1929).[2] There a statute required an instruction to the jury that no inference of guilt shall arise if the accused fails or refuses to testify. The defendant did not take the stand, but in response to testimony that he had

----

[2] We have been referred also to *United States v. Curtiss*, 330 *F.* 2d 278 (2 *Cir.* 1964), and *Redfield v. United States*, 315 *F.* 2d 76 (9 *Cir.* 1963). Both cases involved the conduct of an accused who defended *pro se*. In *Redfield* the court upheld comment on the failure to take the stand where the defendant persisted in making unsworn statements despite the warnings of the trial judge. In *Curtiss* a majority of the court, after finding the defendant had not intelligently waived his right to counsel, concluded the prosecuting attorney's final argument amounted to a comment on defendant's failure to testify whereas the dissenting judge found that "All the prosecutor did was to advert to the fact that Curtiss was relying on his own statements, made in the course of so-called 'argument,' while the real evidence in the case was given by the witnesses who testified under oath." 330 *F.* 2d, at p. 287. Neither case seems in point since they involved the different question as to the consequences to be attributed to irregular and improper trial conduct on the part of a defendant acting *pro se* rather than a fully advised, deliberate purpose to communicate to a jury through the medium of nonverbal behavior. We of course express neither agreement nor disagreement with either of the cited cases.

sent a certain telegram, he wrote samples of his signature in the presence of the jury to the end that his counsel could argue the telegram was not in his hand. The trial court did not charge the statute. The Supreme Court of Washington held this was correct. Referring to the discussion in *Wigmore* we have already cited, the court concluded the defendant had testified quite the same as if he had taken the stand. It added:

"Nor does the fact that Mayer was not formally sworn as a witness negative the view that he, in legal effect, testified in his behalf when he made, in the presence of the jury, these samples of his handwriting. What he there by his act said to the jury was intended by him to be evidence tending to show that he did not write the telegram in question. So we are of the opinion that his failure to be sworn as a witness is not a matter that he can now take advantage of, for the purpose of having the trial court give to the jury the requested instruction upon the theory that he did not testify in his own behalf. 40 Cyc. 2412; 28 R. C. L. 585." 283 *P.*, at *p.* 197

No doubt, had *Malloy* and *Griffin* been decided, the trial court in the case before us would have refrained from making the comment in question, and this for the reason that a close issue should always be avoided in criminal cases if it can be done with fairness to the State. Here the proof of guilt was so overwhelming that the State hardly needed the comment. Indeed, the possibility that it affected the jury's verdict is nil, and hence if there were error, prejudice did not result. See *People v. Bostick*, 44 *Cal. Rptr.* 649, 651, 402 *P. 2d* 529, 531 (*Sup. Ct.* 1965); *cf. State v. Johnson*, 43 *N. J.* 572, 591 (1965), *cert.* granted 86 *S. Ct.* 318 (*U. S. Nov.* 22, 1965). At any rate, defendant's testimonial behavior before the jury justified the comment and in the circumstances a reversal would be unwarranted.

## II.

Next, defendant asserts the seizure of the burglar tools, the loot and the trousers, admittedly made without a search warrant, cannot be sustained as incidental to his arrest. Defendant's position seems to be twofold: (1) the arrest was not based upon probable cause, and (2) there was ample opportu-

nity after the arrest to seek a warrant to search the car. We see no substance in either facet.

■ The facts narrated above amply supported a belief that the occupants of Fioravanti's car had burglarized the dairy. The arresting officers had been informed by radio of the occurrence of the burglary and the theft of the contents of the safe, and that the occupants of the car, described as to make, registration number, and direction of travel, were wanted as the culprits. With this information, the car was stopped and Fioravanti and Belardo arrested at gun point.

■ That the total knowledge of all the policemen constituted probable cause is so evident that no more need be said. Defendant's point seems to be that the arresting officers themselves were not briefed as to all the details of the surveillance and observations. It would be absurd to require such communications within a police department or among police departments as prerequisite for an arrest. Probable cause must be judged on the basis of their composite information, and if that knowledge in its totality shows probable cause, a policeman who makes the arrest upon an ensuing order to do so, acts upon probable cause. See *State v. Murphy*, 85 *N. J. Super.* 391, 397 (*App. Div.* 1964); *State v. Mpetas*, 79 *N. J. Super.* 202 (*App. Div.* 1963); *United States v. Juvelis*, 194 *F. Supp.* 745 (*D. C. N. J.* 1961); *Mardis v. Superior Court*, 218 *Cal. App. 2d* 70, 32 *Cal. Rptr.* 263 (*D. Ct. App.* 1963); *People v. Jackson*, 202 *Cal. App. 2d* 569, 21 *Cal. Rptr.* 44 (*D. Ct. App.* 1962); *People v. Wilson*, 16 *A. D. 2d* 207, 229 *N. Y. S. 2d* 685 (1962); *Richardson v. State*, 97 *Okl. Cr.* 370, 264 *P. 2d* 371 (*Crim. Ct. App.* 1953); *Scaffido v. State*, 215 *Wis.* 389, 254 *N. W.* 651 (*Sup. Ct.* 1934).

■■ Perhaps it is more precise to say, in ultimate constitutional terms, that the arrest and the search and seizure in such circumstances are not "unreasonable," for the Fourth Amendment bars only "unreasonable" searches and seizures, and this is the ultimate test against which a factual complex must be measured. *State v. Bisaccia*, 45 *N. J.* 504, 516 (1965). The Constitution should not be read to quarrel with

the common sense of a situation. A policeman directed to stop a fleeing car and to apprehend its occupants for burglary cannot hold a hearing. He must assume that reason exists for the order and act on that premise. If the arrest is challenged, its reasonableness must be judged, not upon what the arresting officer knew, but upon all the facts known to the police, the meaningful whole which in truth led to the last policeman's action.

The second aspect of the challenge, as articulated below and in the briefs, is that there was no need to search at the time of the arrest, that the car should have been impounded and a search warrant obtained. The short answer is that it is now thoroughly clear that a vehicle may be searched as an incident to an arrest of its occupant without the need for a search warrant. *Preston v. United States*, 376 *U. S.* 364, 84 *S. Ct.* 881, 11 *L. Ed. 2d* 777 (1964).

At the oral argument defendant shifted his complaint to say the search was not made until after defendants had been jailed and hence a warrant was required under the authority of *Preston v. United States, supra.* The case at hand was tried before *Preston* was decided, and no effort was made by defendant to show a factual pattern within the ambit of *Preston.*

In *Preston* the defendants were arrested for "vagrancy." After they were taken into headquarters and booked, the police went to the garage to which the car had been towed and searched the car, thereby finding articles which led to a confession of an interrupted plan to rob a bank. The defendants were then convicted of a conspiracy to that end. The Supreme Court noted the leeway which must be allowed the police in dealing with motor vehicles. The Court referred to the dictates of "common sense" and to the ultimate criterion, "was the search unreasonable" (376 *U. S.*, at *p.* 366–367, 84 *S. Ct.* 881, 11 *L. Ed. 2d*, at *p.* 780). It concluded, on the total facts, that "the search was too remote in time or place to have been made as incidental to the arrest" (376 *U. S.*, at *p.* 368, 84 *S. Ct.*, at *p.* 884, 11 *L. Ed. 2d*, at *p.* 781).

No doubt the basis for the arrest was a factor in the decision in *Preston*. See dissent in *Bowling v. United States*, 122 *U. S. App. D. C.* ——, 350 *F. 2d* 1002, 1004 (*D. C. Cir.* 1965). The charge was "vagrancy" based upon a report of "three suspicious men acting suspiciously," seated in a motorcar parked in a business district since the night before, and their unsatisfactory explanation to the policemen who responded to the report. Thus the search was not related to a known criminal event but rather was in part a search for such an event. In the case before us, there was a known criminal event and the police were looking for the instruments and the fruit of that event. Moreover, we doubt that *Preston* can be read to mean that a search which would be valid at the moment of arrest must be made at that precise moment even though a more prudent or equally prudent course is to move the car and its occupants to a more convenient or suitable place for the search. It could well be that *Preston* turned upon a lack of such continuity of purpose on the part of the arresting officers. In any event, the record in the case at hand makes it plain that the police searched the car at the time of the arrest and saw the bundles and discovered the nature of their contents at that time. Further, the fair inference is that they took effective custody of the bundles at that point, but if we assume that the seizure itself, as distinguished from the search, was delayed until the cars and their occupants reached headquarters, that circumstance would be trivial.

### III.

As we said at the outset, defendant was charged in six counts and convicted upon all. He was sentenced to consecutive jail sentences on the first count for breaking and entering with intent to steal, *N. J. S.* 2A:94–1, and on the sixth count for possession of burglary tools, *N. J. S.* 2A:94–3. The imposition of sentence was suspended with respect to the remaining counts, two of which were for larceny of the money and of the checks in excess of $50, *N. J. S.* 2A:119–2, and two

for receiving such stolen cash and checks, *N. J. S*. 2A:139–1. All of these offenses are high misdemeanors and carry the same authorized punishment. *N. J. S*. 2A:85–6.

At the trial defendant made no objection to the submission of all six charges beyond moving to require the State to elect between the two counts for larceny and the two counts for receiving, contending they were incongruous. The trial court did not require the State to elect, and properly so, since under the proof the jury would be free to accept either of those theses. *State v. Coggin*, 30 *N. J.* 129 (1959). In fact, the trial court's instruction could have been understood by the jury to permit a finding of guilty upon all counts. No objection was taken to the charge, nor was any objection made to the six verdicts when they were received.

Thereafter defendant moved for a new trial on the claim that the verdicts were the result of mistake, partiality, prejudice and passion, the basis being the allegedly inconsistent finding that defendant was guilty of both larceny and receiving. This was an odd way to raise the issue. In fact, as we have noted, the jury's verdicts cannot be said to be inconsistent with a fair understanding of the judge's charge and hence they do not reflect even a palpable departure from a plain instruction.

Sentence was imposed only for the crime of breaking and entering and the crime of possession of burglary tools. The trial judge probably suspended imposition of sentence for larceny and for receiving because he conceived the convictions on the other counts pretty well summed up defendant's criminal venture. It is difficult to see how a supposed misapprehension as to the mutual exclusiveness of larceny and receiving could have led the jury to return the distinct, separate verdicts of guilty upon the offenses of breaking and entering and possession of burglary tools. If this is so, then the issue before us, relating as it does to verdicts upon which the imposition of sentence was suspended, seems quite academic except for some possible impact those verdicts may have upon defendant in some future predicament.

No doubt a jury should be instructed that a defendant cannot be guilty of both larceny and receiving, and hence its verdict should be guilty of one or the other. *State v. Coggin, supra,* 30 *N. J.,* at *p.* 131; *State v. Bozeyowski,* 77 *N. J. Super.* 49, 55 (*App. Div.* 1962); *State v. Shelbrick,* 33 *N. J. Super.* 7, 10 (*App. Div.* 1954). Nonetheless our cases have consistently held that if a general verdict of guilty is returned upon counts for both larceny and receiving, sentence may be imposed, indeed upon the higher offense if they differ as to severity of authorized punishment, so long as the evidence justifies the verdict of guilty as to that count. *State v. Verona,* 93 *N. J. L.* 389, 392 (*E. & A.* 1919); *State v. Friedman,* 98 *N. J. L.* 577 (*E. & A.* 1923); *State v. Shelbrick, supra,* 33 *N. J. Super.,* at *p.* 10; *State v. Rose,* 41 *N. J. Super.* 434, 436 (*App. Div.* 1956); *State v. Quatro,* 44 *N. J. Super.* 120, 127 (*App. Div.* 1957), *cert.* denied 355 *U. S.* 850, 78 *S. Ct.* 73, 2 *L. Ed. 2d* 60 (1957); but see *Milanovich v. United States,* 365 *U. S.* 551, 81 *S. Ct.* 728, 5 *L. Ed. 2d* 773 (1961).

We note that *State v. Harris,* 78 *N. J. Super.* 232 (*App. Div.* 1963), may be incompatible with our cases cited above, none of which it mentioned. There the first count charged breaking and entering with intent to steal, the second charged larceny, and the third charged receiving. The jury returned a verdict of "guilty on all three counts." Upon hearing the verdict the trial court immediately entered into a colloquy with the foreman of the jury, after which the court rephrased the verdict to be "guilty" as to entering and larceny and "not guilty" as to receiving. Upon a poll, the jury concurred in the verdict as expressed by the trial judge.

If we read *Harris* correctly, the Appellate Division concluded from the foreman's response that there was uncertainty as to what the basic factual findings were. It held that "When the jury came in with its original verdict the trial court should have recharged it, stressing the repugnancy of the second and third counts of the indictment, directing it to retire and reconsider its verdict, and to return a verdict not

inconsistent with the court's charge" (78 *N. J. Super.*, at *p.* 238). We note that although the judgment was reversed as to all counts, the repugnancy was stated to be between the second count (larceny) and third count (receiving) and not between the first count (breaking and entering) and the third count (receiving). Further, we. assume the Appellate Division did not mean to say that if the general verdict in that case had been received without objection and without the mentioned colloquy with the jury, the convictions would have been reversed. That view would of course conflict with the prior cases in our State and we would not subscribe to it, even though we agree that a trial judge could appropriately resubmit the case to the jury on his own motion and thereby avoid a doubt which the facts of a particular case might conceivably generate.

In dealing with this problem, we should keep in mind that a layman could think that one who is guilty of a theft may also be guilty of receiving the stolen goods. This is obviously so, for example, when a party to the theft actually receives the stolen property or a share of it from a confederate at a point in time after the actual taking. There the incongruity a lawyer would feel rests more in the legal concept than in the physical fact. Indeed our statute itself tends in all cases to induce in a juror a belief that every thief may also be guilty of receiving upon proof of his possession of the stolen object. The reason is that the statute, *N. J. S.* 2A:139–1, after defining the crime of receiving stolen goods, then says that "possession" of stolen property within one year from the date of the theft "shall be deemed sufficient evidence to authorize conviction" unless the defendant shall show one of five factual patterns, and the fact that the defendant was the thief is not listed among them. Thus a jury, charged in the words of the statute and not explicitly told that one guilty of larceny may not in law be convicted also of receiving, could readily believe that the thief is also guilty of receiving upon proof of his subsequent possession of the stolen articles. In the case before us, not only was the jury charged in terms of

the statute, but also, as we noted above, the charge was so phrased as to lead affirmatively to the impression that the defendant could be found guilty on all counts.

But, while a juror could readily think the thief could be guilty as well of receiving because of his possession, the converse is not true, that is, although "the unexplained and exclusive possession of stolen property shortly after the theft justifies an inference that the possessor is the thief," *State v. Dancyger*, 29 *N. J.* 76, 85 (1959), a juror would not be under the impression that one who he is satisfied was only the receiver of stolen goods should, on that account, also be convicted of their theft. And surely if a juror found only receiving, he could not think that that finding would lead to a verdict of guilty as to breaking and entering or as to possession of burglary tools.

Hence we have no doubt that the individual verdicts before us truthfully reflect findings that defendant in fact possessed the tools for the forbidden purpose, that the defendant did break and enter with the intent to steal, and that defendant did steal the money and the checks. The evidence as to those charges being ample, indeed overwhelming, none of those verdicts is impugned by the further, understandable finding with respect to receiving.

Accordingly the sentences imposed on the first and sixth counts for burglary and possession of burglary tools are valid and should be affirmed; the verdicts of guilty upon the two counts of larceny, as to which the imposition of sentence was suspended, should not be disturbed; and the verdicts of guilty on the two counts for receiving, as to which the imposition of sentence was also suspended, should be vacated.

## IV.

The final point, raised on a motion for a new trial, involves a challenge to the integrity or fitness of one of the jurors, William Satnick. The transcript of the *voir dire* reads:

"May I ask if any of you have ever been the victims of any burglary or larceny from your person or your home or any member of your family has ever been a victim of such a criminal act at any time?
Have any of you ever been witnesses for the State in any criminal prosecution?
I take it that you have not."

Further:

"May I ask any of you at the present time if you know of any reason whatsoever why you could not sit upon this jury and render a verdict which would be fair and impartial both to the State of New Jersey and to John Fioravanti who is on trial here?
I take it that you could."

The motion for a new trial was supported only by the affidavit of a patrolman which states that on March 16, 1964 (seven days before the trial) while on patrol he was notified that premises at 1044-1048 Springwood Avenue, Asbury Park, had been burglarized; that he and his partner found the rear door of the store broken open, and:

"5. I notified Mrs. Sotnick (Bill's wife) that morning about the breaking and entering, and she reported jewelry, cosmetics and kerchiefs missing, total value unknown.
6. Mrs. Sotnick is the wife of William Sotnick, the merchant at the said premises."

It should be obvious that a motion of this kind cannot be heard on an *ex parte* affidavit. There must be live testimony, subject to cross-examination. The argument on the motion revealed the wisdom of that elementary rule.

The question put to the juror, Mr. Sotnick, did not speak of a burglary of one's place of business. Nonetheless if Mr. Sotnick's place of business had been burglarized but seven days before he was questioned on his *voir dire*, one would expect some response, no matter what conclusion would ultimately flow from his silence. One too would be puzzled by Mr. Sotnick's statement on the *voir dire* that "I work for Charles Serling, Inc., Hillside."

At the argument counsel for defendant offered this explanation as to how the situation was uncovered:

"This situation did not come to light until approximately June 3rd, 1964 when this affidavit was signed by Enoch Bryant of the Asbury Park Police Department. This information happened by chance. This information was learned during the trial of a tenancy action in the Monmouth County District Court wherein the landlord of the premises occupied by Mr. Sotnick testified under oath in the Monmouth County District Court concerning these burglaries and Mr. Sotnick was in court at the time in the district court and did not deny the fact that these burglaries did occur."

The assistant prosecutor responded:

"MR. YACCARINO: If it please the Court, the State's position in this matter is that Mr. Sotnick, owner of the place that was supposedly burglarized, operated a dry goods store on Springwood Avenue. This dry goods store has not been operated for one year. That's one of the reasons why there was a landlord tenancy action.
THE COURT: Has not been operated?
MR. YACCARINO: For one year.
THE COURT: Has not been operated.
MR. YACCARINO: That's right, your Honor. It was gutted by fire. It remains boarded up, and it is still there. That's why I suppose there was some litigation between the landlord and tenant for the landlord to take possession of this property again. The only thing left, I think, over there in that store on Springwood Avenue is the adjustment of the claim with the insurance company and the assured."

The State further asserted before us that the articles supposedly taken and unknown as to both quantity and value, were of the nickle and dime variety.

 None of these factual assertions was challenged by counsel for defendant. If true, the picture is one of a store closed for a year because of fire, with only a doubtful interest in the owner in the remnants. If true, the slightest investigation would have revealed it, and if false, a mere view of the premises would have repelled it. We of course need not decide what the facts are. The only question is whether the trial court erred in refusing to order a new trial upon an *ex parte* affidavit which, to boot, is largely hearsay and so skimpy in content as to suggest the draftsman was less than candid. The trial court correctly denied the motion. It did not suffice to impute to the juror a false oath or an inability to sit in judgment of defendant's guilt. *State v. Rosania*, 33 *N. J.* 267, 276

(1960), *cert.* denied 365 *U. S.* 864, 81 *S. Ct.* 828, 5 *L. Ed.* 2d 826 (1961); *Rosania v. State of New Jersey,* 299 *F. 2d* 101 (3 *Cir.*), *cert.* denied 371 *U. S.* 893, 83 *S. Ct.* 192, 9 *L. Ed. 2d* 126 (1962).

The judgments are affirmed, except as to counts 4 and 5 relating to the crimes of receiving, and as to those counts the verdicts are vacated.

*For modification*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN —7.

*Opposed*—None.