170 N.J. Super. 220 (1979)
406 A.2d 203
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
JOSEPH BONTEMPO, PETITIONER-DEFENDANT.
Superior Court of New Jersey, Law Division.
July 20, 1979.
*224 Mr. Brian C. Matthews, Assistant Essex County Prosecutor, for plaintiff-respondent (Mr. Donald Coburn, Essex County Prosecutor, attorney).
Mr. Roger A. Lowenstein for petitioner-defendant (Messrs. Lowenstein, Sandler, Brochin, Kohl, Fisher & Boylan, attorneys).
BAIME, J.D.C.
This is a post-conviction relief proceeding instituted pursuant to R. 3:22-1. Following a protracted jury trial, defendant was convicted of conspiracy, first degree murder while armed, entry with intent to steal, armed robbery, possession of a weapon and escape. The Appellate Division affirmed defendant's convictions in a per curiam opinion, and a petition for certification was subsequently denied by our Supreme Court.
At trial defendant, who did not testify, was permitted to make an unsworn statement to the jury following summations by his attorney and the prosecutor. In his statement defendant alluded to what he perceived to be weaknesses in the State's case. Thereafter the prosecutor was afforded the opportunity to respond. In so doing the prosecutor made repeated references to defendant's failure to specifically deny the charges set forth in the indictment. The prosecutor also noted that defendant's statement was not made under oath and was thus incredible.
In his petition for post-conviction relief defendant contends that the prosecutor's comments constituted a violation of his Fifth Amendment privilege against self-incrimination. He further argues that the "hybrid" procedure adopted by the trial judge deprived him of his right to counsel afforded by the Sixth Amendment. Defendant also contends that the conviction for conspiracy and first degree murder merge and that the trial judge erred when he imposed consecutive sentences with respect to these crimes. Finally, defendant argues that his conviction for escape must be set aside because it was not supported by sufficient evidence.
*225 At issue is whether the prosecutor's allusion to defendant's failure to specifically deny his complicity in the crimes charged requires vacation of the judgments of conviction and a new trial. Other questions raised pertain to whether defendant's conviction for murder and conspiracy merge and whether sufficient evidence was presented to support the jury's finding of guilt with respect to the charge of escape.
The charges against defendant emanated out of the murder of a grocery store owner during the course of a robbery, followed by the apprehension of Bontempo and his codefendant, Joseph Zelinski, and their subsequent escape in a commandeered police vehicle.[1] Defendant's case was severed for the purpose of trial. Following defendant's conviction the trial judge imposed sentences aggregating life imprisonment plus six years in State Prison.[2]
The evidence presented by the State at trial was substantial. Sometime prior to 6 p.m. on April 7, 1974 Nicholas Sena was shot and killed in his grocery store during the course of an apparent robbery. Although there were no eye-witnesses to the homicide, two police officers observed defendant changing his clothes near the scene of the shooting. Upon noticing the presence of the two uniformed patrolmen who had approached in a marked police vehicle, defendant took flight. As the *226 officers pursued defendant they observed him dropping money from his pants pockets. Additionally, a wallet belonging to decedent was subsequently discovered near the area in which defendant had initially been observed. Other clothing and a revolver, apparently not the murder weapon, were also recovered nearby.
Defendant attempted to elude the police officers, but was ultimately apprehended and placed in the patrol vehicle. One of the arresting officers observed defendant attempting to secrete money by removing it from his pocket and placing it beneath the rear seat. At about the same time Zelinski was captured while changing clothes in a nearby telephone booth. With both suspects in the patrol car, the officers attempted to return to the scene for possible identifications. This effort was thwarted by a dramatic escape. Unbeknownst to the police officers, Zelinski was in possession of a revolver in his pants pocket. Although handcuffed, Zelinski managed to secure the weapon. According to the officers, Zelinski pointed the revolver at them and instructed them where to drive. During the ride Zelinski ordered one of the officers to surrender his service revolver and handcuff keys to defendant. The officer partially complied by dropping his revolver to the floor of the automobile and giving the keys to defendant. The officers testified that defendant appeared frightened and at one point told Zelinski not to shoot them. As the automobile approached Bloomfield the two officers suddenly jumped from the vehicle and escaped. Zelinski and one of the policemen exchanged gunfire. Zelinski thereafter drove off, with defendant remaining in the rear seat.
Defendant and Zelinski were ultimately apprehended on April 12, 1974. Together they had fled to defendant's cousin's home in Farmingdale, New Jersey. The cousin, Jacqueline Labota, testified that defendant and Zelinski first appeared at her home on April 9, 1974 and virtually held the family hostage for three days. Defendant told Mrs. Labota and her husband that Zelinski was dangerous and "would hurt [him] if [he] did anything *227 wrong." After defendant and Zelinski had ingested pills rendering both unconscious, Mrs. Labota and her husband escaped and notified the police.
Trooper John Dorrian responded immediately to the Labota home, where he found Zelinski and defendant, both unconscious. Zelinski was lying on the floor with a revolver by his head. Defendant was found in the kitchen with a revolver in his hand. Significantly, expert testimony at trial revealed that the revolver in defendant's possession was the murder weapon.
Perhaps the most damaging evidence against defendant consisted of certain admissions he made to his cousin. Specifically, defendant recounted the events leading up to the murder of decedent. According to defendant, he and Zelinski were in Sena's store on April 7, 1974. He explained that the two believed Sena was involved in an illegal gambling operation and they expected that the victim would thus be in possession of a large quantity of cash. Defendant related to his cousin that they expected to obtain $10,000 from the robbery. Finally, defendant admitted that he had struck the decedent over the head and that Zelinski had shot him during the course of the robbery. Thereafter, the two had escaped from the police.
The events forming the basis for this petition commenced following the State's presentation of its case. After the State had rested defendant moved for a judgment of acquittal out of the presence of the jury. The principal thrust of defendant's argument pertained to the State's alleged failure to prove that he aided or abetted Zelinski in escaping from the arresting officers. Defense counsel contended that defendant had not wilfully participated in the criminal venture. Defendant's argument was premised upon the claim that he had accepted the keys to the handcuffs and the officer's service revolver in accordance with Zelinski's order, and that he was a mere hostage. In short, defendant contended that the State's proof were totally devoid of any evidence which would support a finding by *228 the jury of an intent on his part to escape from the police. In response, the prosecutor argued that defendant's presence in the police vehicle, coupled with his acceptance of the handcuff keys and revolver, revealed an intent to aid or abet Zelinski. While noting that the evidence pertaining to defendant's intent was somewhat equivocal, the prosecutor contended that only Bontempo could testify as to his state of mind.
In denying defense counsel's motion the trial judge held that the State's evidence was sufficient to support an inference of a concert of action between defendant and Zelinski. The judge went on to state that when the "only one who can rebut a fact is the defendant, then he ought to take the stand * * *." Following denial of defendant's motion the trial judge asked Bontempo whether he wished to testify. The judge then granted a brief continuance to afford defendant an opportunity to confer with his attorney. Defendant thereafter informed the judge that he did not wish to testify in his own behalf. Following the judge's inquiry defense counsel requested an instruction regarding defendant's privilege against self-incrimination.
These events occurred on a Friday. On the following Monday both counsel gave their summations. The judge then began instructing the jury when defendant suddenly interrupted and shouted, "I would like to say something." The judge stated that he would hear defendant, but asked the bailiff to remove the jury. Defendant interrupted, again shouting, "I wanted to say it in front of the jury. I feel I am denied a fair trial." The judge iterated that he would hear defendant, but ordered the jury removed. Defendant was not satisfied, however, and again shouted that he wished to be heard immediately. Before the jury could be removed defendant stated that numerous witnesses could establish his innocence, but that they were not available; that he was unable to testify; that he had been incarcerated for seven months but rarely was able to confer with his attorney, and that he was being denied a fair trial. All of these comments were made in the presence of the jury.
*229 Following removal of the jury the trial judge granted a recess and directed defendant to confer with his attorney. Prior to the recess a colloquy ensued between the judge and defendant. The judge advised defendant that he did not wish to foreclose him from making a statement to the jury, but that Bontempo "owed it to [himself] and to [his] case to discuss it with [his] attorney." Defendant apprised the judge of his reasons for refusing to testify. Specifically, defendant stated that he had a poor memory and feared cross-examination. It was defendant's contention that he had suffered a head injury that severely impaired his ability to recall facts. At one point during defendant's lengthy colloquy with the judge, he stated that he would testify if he could produce medical witnesses who would corroborate his testimony pertaining to his head injury. The judge responded by noting that the testimony of such witnesses would be irrelevant unless defendant took the stand. Defendant noted that if he testified, the prosecutor would confront him with his prior criminal record on cross-examination.
After this discussion the trial judge again directed defendant to discuss the matter with his attorney. The judge then stated that he would afford defendant the opportunity to make a closing argument before the jury. He cautioned defendant that if he decided to make such a statement, the State would be given the opportunity to respond.
Following a brief recess defense counsel returned and stated that defendant did not wish to testify, because "if he [took] the stand, he [would] be treated as any [other] witness." Defense counsel then asked the trial judge to question defendant whether he wished to testify. In response to the judge's questions defendant stated that he would "definitely take the stand" if his doctors were permitted to testify. Although the record is somewhat ambiguous, it would appear that defense counsel had contacted defendant's physicians. Apparently their testimony would not have supported defendant's contention that his head injury had impaired his memory. In any event, the judge *230 repeatedly informed Bontempo that his physicians could testify, but only if defendant took the stand. Both the judge and defense counsel agreed that the testimony of medical witnesses pertaining to mental impairment would become relevant only if defendant first took the stand. Following this lengthy colloquy defendant again invoked his Fifth Amendment privilege against self-incrimination and declined to testify.
Thereafter, the trial judge inquired as to whether defendant wished to make a closing argument to the jury. Defense counsel interjected that the judge was affording defendant an "unusual opportunity." Defendant then stated that he wished to make a statement to the jury. The judge again cautioned defendant that the prosecutor would be permitted to respond if Bontempo wished to make a statement. He further informed defendant that the latter's statement would not be under oath and that the jury would be so advised. Defendant again advised the judge of his desire to make a statement to the jury.
The jury was then returned and apprised of defendant's intention to address them. Defendant commenced his statement by advising the jury of the reasons for his failure to testify. Specifically, defendant stated that his memory had been impaired because of various head injuries he had sustained. Defendant also noted that he was not well educated and that the jury should consider that fact in evaluating his statement. Defendant then denied complicity in the crimes charged in the indictment in general terms. According to defendant, he ran from the police because he feared being struck by their automobile. He further denied attempting to secrete the alleged stolen money. According to defendant, the revolver recovered by the police near the scene of the homicide was approximately 10 to 15 feet from where he had been observed initially  a fact he claimed was not brought out during the trial. Defendant denied killing anyone, noting that he was afraid of guns. He characterized himself as an unfortunate hostage, claiming that he was "trapped" in the police vehicle. Defendant emphasized that he *231 was handcuffed and that he did not in any sense assist Zelinski. Defendant contended that he had attempted to leave Zelinski following the escape. Zelinski refused defendant's request, however, and the two proceeded to Bontempo's cousin's home. According to defendant, he deliberately ingested large quantities of pills to insure that his cousin could escape and inform the police.
Following defendant's closing statement, the prosecutor was afforded an opportunity to respond. He first noted that defendant's statement was not under oath. He then emphasized that defendant had not answered many questions, including whether Bontempo was in Sena's store on the day of the alleged crime; whether he was with Zelinski; whether they intended to commit a robbery; whether he struck decedent, and whether he fled from the scene of the homicide. The prosecutor then correctly noted that defendant's account of the day commenced with his flight from the police. He ridiculed defendant's claim that the latter had fled by virtue of his fear of being struck by the police vehicle. With regard to this point, the prosecutor emphasized that defendant's statement was not under oath and was not subject to cross-examination.
The prosecutor turned to other matters mentioned by defendant in the latter's statement. As noted previously, defendant denied having attempted to secrete the allegedly stolen money as he fled from the police. Defendant had explained that he would have placed the money in the pockets of the trousers he was alleged to have worn underneath his clothing had that been his intention. The prosecutor questioned how defendant could have known that the pants had pockets because he had not seen them during the course of the trial. Defendant then interjected that he had seen a photograph depicting the trousers. The prosecutor concluded his remarks by noting that while defendant had made a statement, decedent did not have that opportunity "because he [was] dead" and that Bontempo did not answer certain questions "because there [was] nothing he [could] say."
*232 In his instructions to the jury, the trial judge stated that comments by the attorneys were not binding and that the guilt or innocence of the accused was to be determined "from all of the evidence presented." In a similar vein, the judge added that defendant's statement did not constitute evidence. Specifically, the judge stated that defendant's closing remarks were of "no evidential value" and were "not to be used during [the jury's] deliberations as evidence." He also instructed the jury that defendant's failure to take the stand could not lead to an inference adverse to him. As stated by the judge, "the fact that defendant [did] not take the stand does not allow any inference of guilt to be drawn by the jury."

I
The threshold question presented is whether defendant's petition should be dismissed summarily because several of the contentions advanced presently were not raised on direct appeal, while others were arguable adjudicated by the Appellate Division. It is axiomatic that post-conviction relief proceedings are not a substitute for direct appeal. R. 3:22-3. See also, State v. Gibson, 68 N.J. 499, 513 (1975); State v. Trantino, 60 N.J. 176, 180 (1972); State v. Smith, 43 N.J. 67, 74 (1964), cert. den. 379 U.S. 1005, 85 S.Ct. 731, 13 L.Ed.2d 706 (1965), reh. den. 380 U.S. 938, 85 S.Ct. 945, 13 L.Ed.2d 826 (1965). Only recently our Supreme Court had occasion to reiterate the time-honored rule that "in the absence of the timely raising of an issue available on direct appeal or a constitutional infringement, relief will be granted in such proceedings only in exceptional circumstances involving a showing of fundamental injustice." State v. Cerbo, 78 N.J. 595, 605 (1979). Stated some what differently, if the issue could have been raised on direct appeal, see State v. Nash, 64 N.J. 464, 474-475 (1974); State v. Koch, 118 N.J. Super. 421, 429 (App.Div. 1972), but was not, it is cognizable only if the alleged error deprived defendant of his "fundamental right to a *233 fair trial" or was of constitutional dimension. State v. Reynolds, 43 N.J. 597, 602 (1965), cert. den. 377 U.S. 1000, 84 S.Ct. 1934, 12 L.Ed.2d 1050 (1965).
It is equally well settled that a prior adjudication upon the merits of an issue on direct appeal is conclusive. R. 3:22-5. An issue once decided, even of constitutional dimensions, may not be relitigated. State v. Trantino, supra 60 N.J. at 180; State v. Smith, supra 43 N.J. at 74. In short, an issue may not be considered in post-conviction relief proceedings if the question was decided on direct appeal. A prior adjudication upon the merits precludes reconsideration of the question. State v. Johnson, 43 N.J. 572, 592 (1965), aff'd 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1965), reh. den. 385 U.S. 890, 87 S.Ct. 12, 17 L.Ed.2d 121 (1966); State v. Bass, 141 N.J. Super. 170, 171 (App.Div. 1976); State v. Odom, 113 N.J. Super. 186, 191 (App. Div. 1971).
Defendant's arguments must be considered within the context of these well recognized principles. In his petition defendant raises four grounds for post-conviction relief. The first argument presented is grounded upon an alleged deprivation of Fifth Amendment rights arising out of the prosecutor's rebuttal to defendant's statement. In his Appellate Division brief defendant contended that "[t]he unorthodox procedure employed by the trial judge * * * fostered hybrid representation, infringed upon the [Fifth Amendment] right to remain silent [and thereby] deprived him of a fair trial." While noting that "the prosecutor [was afforded the opportunity to deliver] a second summation in order to rebut defendant's unsworn statement," defense counsel did not expressly articulate the manner in which the procedure was said to be violative of the Fifth Amendment. Although ambiguously phrased, the principal thrust of defendant's Appellate Division argument pertained to the procedure utilized by the trial judge rather than the comments of the prosecutor in rebuttal. Careful examination of defendant's brief indicates that the Fifth Amendment claim raised on appeal *234 centered about the procedure adopted by the trial judge and bore a very limited relation to the alleged impropriety committed by the prosecutor in his second summation.[3] Nor did the Appellate Division's per curiam decision deal directly with the question presented here. The Appellate Division merely concluded that the argument advanced by defendant was "clearly without merit." See R. 2:11-3(e)(2).
Under these circumstances, it would be unfair to bar defendant from advancing the Fifth Amendment claim presented in his petition. To be sure, the argument advanced here and that presented in defendant's Appellate Division brief are similar. Nevertheless, the United States Supreme Court has held in a somewhat related context that federal judicial review of constitutional questions on habeas corpus should be denied only where it is clear that the identical issues or "substantially equivalent" arguments were not presented initially in the state courts. See Picard v. Connor, 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). See also United States ex rel. Trantino v. Hatrack, 563 F.2d 86 (3 Cir.1977), cert. den. 435 U.S. 928, 98 S.Ct. 1499, 55 L.Ed.2d 524 (1978); Zicarelli v. Gray, 543 F.2d 466 (3d Cir.1976). By analogy, that rule should be applied with equal force here. Preclusion of consideration of an argument presented in post-conviction relief proceedings should be effected only if the issue raised is identical or substantially equivalent to that adjudicated previously on direct appeal. Applying that standard, defendant's oblique reference in his Appellate Division brief to the prosecutor's rebuttal to his unsworn statement should not bar judicial resolution of the issue presented in his petition for post-conviction relief.
It is clear that defendant's second argument was advanced on direct appeal and was found to be devoid of merit. Defendant *235 contends that the procedure employed by the trial judge deprived him of the right to be interrogated by counsel. In support of his contention defendant heavily relies upon Ferguson v. Georgia, 365 U.S. 570, 81 S.Ct. 756, 5 L.Ed.2d 783 (1961). There the Supreme Court considered the constitutionality of a Georgia statute which accorded a defendant in a criminal case the right to make a statement to the jury, but prevented him from testifying. The Supreme Court concluded that such a procedure deprived the accused of his Sixth Amendment right to counsel because it "set [defendant] adrift in an uncharted sea with nothing to guide him * * *." Id. at 593, 81 S.Ct. at 769. In this petition, defendant contends that the procedure adopted by the trial judge ran afoul of the Supreme Court's decision in Ferguson.
Substantially the same argument was presented in defendant's Appellate Division brief. Quoting extensively from the decision in Ferguson, defendant contended that he was deprived of his Sixth Amendment right to counsel. Since the issue was presented and decided on direct appeal, defendant is now precluded from relitigating the question.[4]
Defendant's third argument in support of his petition is that his conviction for conspiracy merges with that of murder in the *236 first degree. In essence, defendant contends that conspiracy constitutes a lesser included offense of felony murder. This argument was not advanced on direct appeal and thus cannot be considered in post-conviction proceedings unless denial of relief would offend either the Federal or State Constitution or result in fundamental injustice.
It is arguable that the prohibition against double punishment is of constitutional dimension. State v. Davis, 68 N.J. 69, 76 (1975). Several commentators have contended that the merger doctrine is incorporated in the Fifth Amendment's double jeopardy clause. See, e.g., Comment, "Twice in Jeopardy," 75 Yale L.J. 262, 302-304 (1965). Others have disagreed on the basis that double jeopardy evolved as a reaction to the "prodigious prosecution advantages" of the early common law and was thus calculated to secure finality in criminal litigation by protecting defendants from the threat, harassment and stigma of repeated criminal trials. See Note, "Consecutive Sentences in Single Prosecutions: Judicial Multiplication of Statutory Penalties," 67 Yale L.J. 916, 918 (1958). It has also been suggested that the prohibition against multiple punishment for a single wrongdoing is predicated upon substantive due process. State v. Davis, supra at 77.
Whatever its legal etiology, the merger doctrine is deeply rooted in our jurisprudence and comports with fundamental notions of fairness. See State v. Ruiz, 68 N.J. 54, 66 (1975) (Justice Pashman dissenting); State v. Jamison, 64 N.J. 363, 380 (1974); State v. Hill, 44 N.J. Super. 110, 112 (App.Div. 1957). The doctrine insures that the punishment imposed is commensurate with the defendants's criminal liability and moral culpability. It serves to limit "judges and prosecutors alike to acting within the bounds of the legislative design." State v. Ruiz, supra 68 N.J. at 77. Whether it be by force of double jeopardy, substantive due process or some other legal tenet, the prohibition against multiple punishment for a single criminal act is of such a fundamental nature as to be cognizable in post-conviction *237 proceedings, at least where, as here, its application would affect drastically the quantum of the sentence imposed. Although defendant should have raised the question on direct appeal, it would be unjust to preclude him from presenting the issue on post-conviction relief, particularly in light of the consecutive sentences imposed by the trial judge.[5]
Defendant's final contention pertains solely to his conviction for escape. Specifically, defendant argues that the evidence presented at trial did not support the escape conviction and that the jury's verdict was inconsistent. Plainly, the claim that the jury's verdict was against the weight of the evidence is not grounds for post-conviction relief.[6] See State v. Morales, 120 N.J. Super. 197 (App.Div. 1972). Equally unavailing is defendant's argument pertaining to inconsistent verdicts. Suffice it to say, an inconsistent verdict is not per se ground for reversal and, in any event, cannot be the basis for collateral attack on an *238 otherwise valid judgment. State v. Still, 112 N.J. Super. 368 (App.Div. 1970), certif. den. 57 N.J. 600 (1971).

II
Defendant first contends that the prosecutor's comments rebutting his unsworn statement were violative of the Fifth Amendment privilege against self-incrimination.[7] In support of his argument defendant heavily relies upon Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), reh. den., 381 U.S. 957, 85 S.Ct. 1797, 14 L.Ed.2d 730 (1965). There the Supreme Court held that the Fifth Amendment's proscription against compelled self-incrimination barred "either comment by the prosecution on the accused's silence or instructions" by the judge permitting an unfavorable inference to be drawn by virtue of the defendant's invocation of his constitutional rights. Id. at 615, 85 S.Ct. at 1233. The rule set forth in the Griffin decision is premised upon the proposition that adverse comment by court or counsel constitutes a "penalty imposed * * * for exercising a constitutional privilege." Id. at 615, 85 S.Ct. at 1232, 1233. Suffice it to say, our courts have broadly construed the Griffin rule in a long line of decisions prohibiting comment, either directly or by implication, alluding to the accused's failure to testify. See, e.g., State v. Di Rienzo, 53 *239 N.J. 360 (1969); State v. Lanzo, 44 N.J. 560 (1965); State v. Sims, 140 N.J. Super. 164 (App.Div. 1976); State v. Persiano, 91 N.J. Super. 299 (App.Div. 1966).
Quite obviously, the essential predicate to defendant's argument is that he did in fact remain silent. Stated somewhat differently, defendant asserts that the failure to testify under oath is equivalent to remaining silent under the Fifth Amendment. In short, defendant contends that his unsworn statement was "non-testimonial" in nature and thus did not serve to waive his right to prevent the prosecutor from alluding to his failure to take the stand and rebut the State's evidence.
Defendant's argument must be considered within the context of the historical roots from which the privilege against self-incrimination had its genesis. The Fifth Amendment privilege developed "as a reaction to the practice in the early English courts of compelling a witness to be sworn and give testimony concerning his guilt or innocence." State v. King, 44 N.J. 346, 357 (1965). See also Weintraub, "Voice Identification, Writing Exemplars and the Privilege Against Self-Incrimination," 10 Vand.L.Rev. 485, 486-90 (1957). "In the light of this history the text writers and the overwhelming majority of the courts have limited the scope of the privilege to what Wigmore characterizes as `testimonial compulsion,' i.e., `compulsion to do those things which a witness would by traditional judicial processes be required to do.'" State v. King, supra at 357, citing McCormick, Evidence § 126 (1954). Therefore, the Fifth Amendment privilege is not implicated where the accused is placed in a lineup, or fingerprinted, or photographed, or examined for bodily characteristics. See, e.g., Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1969); Breithaupt v. Abram, 352 U.S. 432, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957); State v. Cary, 49 N.J. 343 (1967); State v. Blair, 45 N.J. 43 (1965).
*240 This much conceded, communicative behavior by an accused at trial may be considered "testimonial" notwithstanding his refusal to take the stand. Decisions in this State and in other jurisdictions have held that a defendant's words or conduct at trial, although not under oath or subject to cross-examination, may be such that it cannot be said the accused remained silent. In State v. Fioravanti, 46 N.J. 109 (1965), cert. den. 384 U.S. 919, 86 S.Ct. 1365, 16 L.Ed.2d 440 (1966), for example, our Supreme Court held that a demonstration by the accused, who had not taken the stand, constituted "testimonial" evidence, thereby waiving the prohibition against judicial and prosecutorial comment pertaining to the failure to testify. At the conclusion of the case the defendant donned a pair of trousers allegedly taken from him during the crime and walked before the jury. In his summation defense counsel argued that the pants could not have belonged to the accused because they did not fit. In his instructions to the jury the trial judge commented on defendant's failure to take the stand.[8] On appeal defendant argued that the trial court's comments contravened the principles mandated in Griffin v. California, supra.
Our Supreme Court held that the demonstration was "testimonial" in nature, principally because it sought to rebut portions of the State's proofs. Noting that "one can communicate by gesture as effectively as by word," the court found that defendant had "[chosen] to communicate with the jury." Id. at 119. The court went on to state that "[i]t would distort the truth-finding process to expect the jurors to weigh what the defendant chooses to reveal and to be oblivious of his silence as to the remainder." Id. at 118. Citing Caminetti v. United States, 242 *241 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442 (1917), the court concluded that "when a defendant chooses to speak as to only a part of the direct proof against him" it may be inferred that "he is unable to dispute the balance." State v. Fioravanti, supra, 46 N.J. at 118. That Fioravanti "chose a technique whereby he succeeded in avoiding cross-examination," did not preclude the court and the prosecutor from commenting upon his failure to answer or rebut the State's proofs. Id. at 119.[9]
Other cases have similarly recognized that an accused's conduct at trial may be considered testimonial in nature. In State v. Schultz, 46 N.J. 254 (1966), cert. den. 384 U.S. 918, 86 S.Ct. 1367, 16 L.Ed.2d 439 (1966), defendant chose to represent himself and in so doing persisted in making statements to the jury in the guise of propounding questions. On several occasions, *242 defendant made specific assertions of fact without the pretense that they were intended as questions. In responding to defendant's improper conduct the prosecutor referred to Schultz' failure to take the stand. In addition, the trial judge commented upon defendant's failure to testify, advising the jury that they could draw an unfavorable inference by virtue of Schultz' silence.[10] On appeal, our Supreme Court affirmed defendant's conviction. The court held that defendant's conduct "warrant[ed] comment, in the nature of a fair response, which call[ed] attention to [his] failure to take the stand." Id. at 258.
Similarly, in Redfield v. United States, 315 F.2d 76 (9 Cir.1963), defendant appeared pro se and "persistently testified, though not under oath, throughout his trial." Id. at 80. On several occasions the trial judge advised defendant in the presence of the jury that he had the right to take the stand and suggested that he do so. The Court of Appeals held that the trial judge's comments were proper since defendant had testified in the guise of propounding questions to witnesses.
In United States v. Kaufman, 429 F.2d 240 (2 Cir.1970), cert. den. 400 U.S. 925, 91 S.Ct. 185, 27 L.Ed.2d 184 (1970), defendant appeared pro se and repeatedly made statements directly to the jury. In the presence of the jury the trial judge admonished defendant and noted that he had the right to testify. On appeal defendant argued that the trial judge's remarks infringed upon his Fifth Amendment right to remain silent. The Court of Appeals was unpersuaded, however, in affirming defendant's conviction the court noted that "to the extent that some of [Kaufman's] statements might be construed as testimony he may have waived his right to refuse to testify." Id. at 246.
*243 Likewise, in United States ex rel. Miller v. Follette, 397 F.2d 363 (2 Cir.1968), cert. den. 393 U.S. 1039, 89 S.Ct. 660, 21 L.Ed.2d 585 (1969), defendant represented himself and without taking the stand used his position as attorney to make unsworn statements of fact. During his summation the prosecutor specifically referred to defendant's refusal to testify. Following his conviction Miller filed a petition for a writ of habeas corpus in the Federal District Court. In an exhaustive opinion the District Court denied defendant's application upon the basis that Miller's unsworn statements were testimonial in nature. United States ex rel. Miller v. Follette, 278 F. Supp. 1003, 1007 (E.D.N.Y. 1968). In affirming the denial of defendant's petition the Court of Appeals stated that "to regard the prosecutor's restrained remark as an error of constitutional proportions would glorify technicality."[11] 397 F.2d 367.
A contrary view was expressed by the Court of Appeals for the Second Circuit in United States v. Curtiss, 330 F.2d 278 (1964). There defendant dismissed his appointed attorney prior to trial. On the date set for trial the judge noted that defendant had expressed a preference to act as his own attorney. However, the judge requested the court-appointed attorney to sit with defendant and be available for advice. During his summation defendant commented upon matters not in evidence. In reply the prosecutor admonished the jury not to believe defendant's "bold face lies, not under oath." Id. at 281. The prosecutor pointedly compared defendant's refusal to make a sworn statement with the testimony of the Government's witnesses. Defendant's conviction was subsequently reversed on *244 appeal upon the basis that defendant had not properly waived his right to an attorney. Id. at 280. Specifically, the court held that "[t]here was nothing in the record to show an explanation of defendant's right to counsel [pursuant to federal rules], nor [was] there a clear cut election." Ibid. As an alternative basis for the reversal, the court found that the prosecutor's comments violated the defendant's Fifth Amendment rights. Id. at 287. Judge Medina vigorously dissented. Noting that he was "at a loss to see any infringement of [the defendant's] rights under the Fifth Amendment," Judge Medina concluded that the prosecutor's remarks were entirely appropriate.
Research discloses that the majority opinion in United States v. Curtiss, supra,[12] is contrary to the great weight of authority throughout the nation. The Curtiss decision is less persuasive than those cited previously, particularly within the context of the facts presented here. To be sure, the question raised in this case is of first impression. Nevertheless, the rationale underlying the decisions cited compels the conclusion that defendant's testimonial behavior before the jury justified the prosecutor's rebuttal. Where, as here, a defendant's unsworn statements take on a "testimonial" color, the jury might well be misled. The accused thereby "gather[s] an advantage that is false, for less than the whole truth may affirmatively mislead." State v. Fioravanti, supra, 46 N.J. at 118. Thus, a defendant who "undertakes to answer part of the evidence against him [in a testimonial manner] is subject to comment as to factual thrusts he does not meet." Id. at 117. Here, the *245 prosecutor's comments constituted proper rebuttal and did not serve to violate defendant's Fifth Amendment rights.
Contrary to defendant's argument, it is clear that neither the trial judge nor the prosecutor encouraged or precipitated defendant's statement to the jury. It is true that several of the judge's remarks pertaining to whether defendant should testify would have been better left unsaid. However, these comments must be considered in the context within which they were made. Specifically, the judge was merely responding to defendant's contention that he did not possess the requisite mens rea, and thus the State had failed to present a prima facie case. The judge's comment and that of the prosecutor to the effect that only defendant could explain his state of mind surely did not have the capacity to coerce Bontempo into waiving his right to remain silent.
The trial judge fully apprised defendant of his Fifth Amendment privilege. Defendant was advised that if he were to make an unsworn statement, the prosecutor would be permitted to respond. Defense counsel was afforded an opportunity to discuss the issue with defendant and advise him accordingly.[13] The trial judge precluded defendant from making a statement until he considered all of the resulting ramifications. Under these circumstances the trial record plainly belies defendant's contention that his decision to make a statement was the product of *246 unlawful coercion. Indeed, defendant demanded the opportunity to apprise the jury of facts which he perceived supported his innocence. In point of fact, defendant successfully testified without being subject to cross-examination, and the jury was never apprised of his criminal record.
No doubt, the strength of the State's proofs placed substantial pressure on defendant to forego his right to remain silent. It is well settled, however, that not every "compelling" influence resulting in an individual's decision to testify violates the Fifth Amendment privilege. Pressures necessarily come to bear on an individual whose activities are the subject of a criminal charge. The very fact of the trial, the probative weight of the proofs adduced, may influence an accused to alter his intention to remain silent. See State v. Falco, 60 N.J. 570, 581-85 (1972). As the United States Supreme Court has noted so often, an accused "in a criminal trial is frequently forced to testify himself * * * in an effort to reduce the risk of conviction." Williams v. Florida, 399 U.S. 78, 83-84, 90 S.Ct. 1893, 1897, 26 L.Ed.2d 446 (1970). "The criminal process, like the rest of the legal system, is replete with situations requiring `the making of difficult judgments' as to which course to follow." McGuatha v. California, 402 U.S. 182, 213, 91 S.Ct. 1454, 1470, 28 L.Ed.2d 711 (1971). The resulting "compulsion" may spring from a panoply of sources, but "the Constitution does not by that token forbid requiring [the defendant] to choose." Id.
Defendant contends that his decision to make a statement to the jury cannot be considered a voluntary, intelligent and knowing waiver of his right to remain silent. Defendant points to his limited education, his mental deficiencies and his poor emotional state at the time of trial.[14] This court has *247 carefully reviewed the record in that regard and has considered the affidavits and testimony presented by defendant in support of his contention. Succinctly stated, the record does not support defendant's argument that he was unable to understand and appreciate the alternative courses open to him with regard to his right to remain silent. That defendant perhaps misconceived the potential strength of the prosecutor's rebuttal does not make his waiver any the less voluntary, knowing or intelligent. The Fifth Amendment says no more than a man shall not be "compelled" to speak. It does not say that a defendant, fully apprised of his rights and given ample opportunity to choose, cannot elect to forego exercising his privilege to remain silent. In sum, the record is manifest that no unlawful coercion or pressure was exercised to compel defendant to waive his Fifth Amendment rights.
In any event, proof of guilt was so overwhelming and the possibility of prejudice flowing from the prosecutor's comments so remote as to preclude post-conviction relief. It would be superfluous to summarize the State's evidence. It is enough to say that the trial record fairly reeks of defendant's guilt.
*248 One further matter should be noted in this respect. In assessing the impact of the prosecutor's comments it is significant that defendant, in his statement to the jury, repeatedly referred to his failure to take the stand. Defendant specifically alluded to his refusal to testify and explained in great detail the reason supporting his decision in that regard. Defendant's direct reference to his failure to take the stand and his accompanying explanation were an invitation to the prosecutor to comment upon the subject. Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); United States v. Hephner, 410 F.2d 930, 935 (7 Cir.1969). Cf. Babb v. United States, 351 F.2d 863 (8 Cir.1965); State v. Walker, 80 N.J. 187 (1979). More importantly, defendant's remarks focused the jury's attention on his silence. It seems clear that the prosecutor's closing comments added nothing to the impression that had already been created by defendant's explanation for his refusal to testify under oath. Assuming that constitutional error was committed, it was harmless beyond a reasonable doubt. Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), reh. den. 386 U.S. 987, 87 S.Ct. 1283, 17 L.Ed.2d 241 (1967); Fahy v. Connecticut, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963); United States v. Warner, supra; United States ex rel. O'Connor v. New Jersey, 405 F.2d 632 (3 Cir.1969), cert. den. Yeager v. O'Connor, 395 U.S. 923, 89 S.Ct. 1770, 23 L.Ed.2d 240 (1969); State v. Fioravanti, supra.
What has been said thus far should not be construed as an endorsement of the procedure adopted by the trial judge in this case. Although the Appellate Division affirmed defendant's conviction, it did not say that the trial judge was correct in permitting defendant to make an unsworn statement to the jury. Nor did the court express its approval with respect to the procedure employed. Further, examination of our court rules reveals nothing which would permit a defendant to make such a *249 statement. The procedure adopted by the trial judge is without precedential support and is of doubtful utility.

III
Defendant's final contention is that his conviction for conspiracy merged with that of felony murder, and hence the trial judge improperly imposed consecutive sentences with respect to the two offenses.[15] Defendant's argument is grounded upon the claim that his participation in the conspiracy to commit robbery made him vicariously liable for the acts of Zelinski. Since the State proceeded upon the theory that Zelinski alone fired the fatal shot, it is argued that defendant's complicity in the felony murder was based solely upon his participation in the conspiracy to rob the decedent. Citing the so-called "Wharton's rule", defendant claims that the conspiracy constituted a lesser included offense of felony murder. More specifically, defendant refers to the following statement contained in Wharton's treatise:
When to the idea of an offense a multiplicity of agents is logically necessary, conspiracy, which assumes the voluntary accession of a person to a crime of such a nature that it is aggravated by a plurality of agents cannot be maintained. [Wharton, Criminal Law (12 ed. 1932), § 1604, at 1862]
The short answer to defendant's argument is that the substantive offense of felony murder does not require a multiplicity of agents. Stated another way, "[t]he key concept [underlying Wharton's rule] is that an agreement between two persons is necessary for the completion of the substantive crime." State v. Maddox, 153 N.J. Super. 201, 212 (App.Div. 1977). See also State v. Seaman, 114 N.J. Super. 19, 32 (App.Div. 1971), certif. den. 58 N.J. 594 (1971), cert. den. 404 U.S. 1015, 92 S.Ct. 674, 30 L.Ed.2d 662 (1971); State v. Lennon, 4 N.J. Super. *250 415, 420 (App.Div. 1949), aff'd 3 N.J. 337 (1949). Here the conspiracy involved a crime which by its nature need not have been committed by two or more persons, State v. Sherwin, 127 N.J. Super. 370, 386 (App.Div. 1974), certif. den. 65 N.J. 569 (1974), cert. den. 419 U.S. 801, 95 S.Ct. 9, 42 L.Ed.2d 32 (1974). For this reason alone, Wharton's rule is inapplicable.
Further, defendant's complicity in the robbery which led to the killing of decedent was not based solely upon his participation in an unlawful agreement. This is not a case in which defendant's criminal liability for the substantive crime is based totally upon vicarious liability. See, e.g., State v. Stein, 70 N.J. 369, 388 (1976); State v. Madden, 61 N.J. 377, 392 (1972). Defendant's statement to his cousin revealed that he was present and actually assisted during the commission of the robbery. Defendant was apprehended immediately after the homicide and in close proximity to the scene of the crime. In no sense can it be said that defendant's complicity in the robbery was limited to his having entered into a conspiracy, the purpose of which was to rob the decedent.
In any event, it is no longer open to question that a conspiracy is a separate and distinct crime from the substantive offense embraced within the unlawful agreement. State v. Maddox, supra, 153 N.J. Super. at 211. See also, United States v. Dansker, 537 F.2d 40 (3 Cir.1976), cert. den. 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977); United States v. Pappas, 445 F.2d 1194 (3 Cir.1971), cert. den. 404 U.S. 984, 92 S.Ct. 449, 30 L.Ed.2d 368 (1971). Nor can there be any doubt that separate sentences may be imposed for a conspiracy and the substantive crime which formed its object. State v. Maddox, supra 153 N.J. Super. at 211, 379 A.2d 460. A conspiracy constitutes a separate crime because it is felt, quite properly, that when two or more persons combine to accomplish a criminal purpose, greater public danger is presented. Defendant's claim that the trial judge erroneously imposed consecutive sentences for conspiracy and felony murder is, therefore, devoid of merit.
NOTES
[1] Defendant was charged in a multi-count indictment with conspiracy, entry with intent to steal, entry with intent to rob, murder, assault with intent to rob, armed robbery, kidnapping, assault with intent to kill, two counts of possession of a revolver, larceny and escape.
[2] Defendant was convicted of conspiracy, entry with intent to steal, murder, two counts of armed robbery, two counts of possession of a revolver, and escape. He was sentenced to life imprisonment for felony murder. A concurrent sentence of from one to two years was imposed on the armed robbery conviction. Consecutive sentences were imposed consisting of from two to three years for conspiracy and from two to three years on the escape charge. Suspended sentences were imposed pertaining to defendant's convictions for entry with intent to steal, one count of armed robbery and two counts of possession of a revolver.
[3] Oral argument was not requested by either the prosecutor or defense counsel, and was thus waived. See R. 2:11-1(b).
[4] In any event, defendant's argument is totally devoid of merit. As noted, the Supreme Court in Ferguson, supra, struck down a Georgia statute that prohibited a defendant from testifying, but allowed him to give a sworn statement. Under the Georgia procedure the accused was not afforded a choice. The accused could give a sworn statement, but was not permitted to testify. The court held that it was unconstitutional to deny defendant "the right to have his counsel question him * * *." Id. at 596, 81 S.Ct. at 770. In this case defendant was given a choice. He could have elected to testify. The trial judge expressly advised defendant of his right to take the stand. Contrary to defendant's contention, the judge clearly stated that Bontempo's medical witnesses would be permitted to testify if he took the stand. The decision in Ferguson was not implicated, much less violated, by defendant's election to give an unsworn statement.
[5] The court is not unmindful of the recent decision in State v. DeSanto, 157 N.J. Super. 452 (1978). There the Superior Court, Law Division, held that decisions expanding the applicability of the doctrine of merger could not be retroactively applied in post-conviction relief proceedings. In dictum the court noted that the "fundamental injustice" exception to R. 3:22-4(b) was inapplicable because the refusal to apply the merger doctrine was not "egregious" under the particular circumstances. Id. at 459. The court emphasized, however, that defendant's sentence would not have been reduced "even if he were successful since the [penalties challenged] were to be served concurrently." Id. n. 4. Here the trial judge imposed consecutive sentences with respect to murder in the first degree and conspiracy. If defendant is correct in the argument advanced presently, his sentence will thus be reduced substantially.
[6] After this petition was argued, the Supreme Court rendered its decision in Jackson v. Virginia, ___ U.S. ___, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), and held that a state criminal conviction could be collaterally attacked upon the basis that no rational trier of fact could have found proof beyond a reasonable doubt. Examination of the record here reveals substantial evidence supporting the jury's verdict.
[7] It is to be noted that the State does not argue, nor could it, that defendant's statement constituted a summation and that he was appearing pro se at that juncture of the proceedings. Every reasonable presumption against waiver of the constitutional right to counsel should be indulged. See State v. Wiggins, 158 N.J. Super. 27 (App.Div. 1978).

Further, the record is barren of any evidence that defendant was granted the right to act as cocounsel. See State v. McCleary, 149 N.J. Super. 77 (App.Div. 1977); certif. den. 75 N.J. 26 (1977); State v. Pratts, 145 N.J. Super. 79 (App.Div. 1975), aff'd 71 N.J. 399 (1976). Finally, the trial judge advised defendant that he could refer to matters not in evidence when making his statement to the jury. Plainly, defendant's statement was not a summation subject to the prosecutor's rebuttal.
[8] The decision in Griffin v. California, supra, was rendered during the interval between the trial and the Supreme Court's opinion in Fioravanti. In State v. Lanzo, 44 N.J. 560 (1965), our Supreme Court held that Griffin applied to all cases on direct appeal. Griffin was thus fully applicable in Fioravanti.
[9] In an attempt to distinguish Fioravanti defendant states that "it is questionable whether the holding has any force of law today." The sole support for this statement is a later Court of Appeal's decision holding that mere physical demonstrations are not "testimonial in nature," and therefore will not be considered partial answers by a defendant to the testimony elicited against him. In particular, defendant relies on United States ex rel. Mitchell v. Pinto, 438 F.2d 814 (3 Cir.1971), cert. den. 402 U.S 961, 91 S.Ct. 1622, 29 L.Ed.2d 124 (1971), which held that a demonstration by defendant was not a "testimonial act" because of the line of cases holding that an accused can be required to appear in lineups without violating the Fifth Amendment. Id. at 816-817. Since defendant's actions were not testimonial in nature, the court reasoned comment on the accused's failure to testify as to other facts violated Griffin. Id. at 818. Mitchell impacts on Fioravanti, if at all, not on the issue of whether there can be comment on a defendant's silence as to some matters when he offers a statement of a "testimonial nature." Rather, that case concerns whether a demonstration is of a "testimonial nature". That this is all Mitchell can be said to stand for has been noted by the Appellate Division as well. State v. Bonet, supra, 132 N.J. Super. 186, 190 (App.Div. 1975).

If Mitchell can be said to overrule Fioravanti, this State's trial judiciary would nonetheless be obliged to apply the decisions of New Jersey's highest court. Franco v. Davis, 51 N.J. 237, 238-39 (1968). A decision of a federal court is not binding, although it is entitled to respectful consideration. See State v. Norflett, 67 N.J. 268, 286 (1975); State v. Coleman, 46 N.J. 16, 35-37 (1965), cert. den. 383 U.S. 950, 86 S.Ct. 1210, 16 L.Ed.2d 212 (1966); Velnohos v. Maren Engineering Corp., 168 N.J. Super. 520 (App.Div. 1979).
[10] The Supreme Court's decision in Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), was rendered on the last day of the trial. The Griffin decision was therefore applicable. See State v. Lanzo, supra.
[11] See also, United States v. Warner, 428 F.2d 730 (8 Cir.1970), cert. den. 400 U.S. 930, 91 S.Ct. 194, 27 L.Ed.2d 191 (1970); United States v. Lacob, 416 F.2d 756 (7 Cir.1969), cert. den. 396 U.S. 1059, 90 S.Ct. 755, 24 L.Ed.2d 754 (1970), reh. den. 397 U.S. 1003, 90 S.Ct. 114, 25 L.Ed.2d 915 (1970); State v. Mayer, 154 Wash. 667, 283 P. 195 (Sup.Ct. 1929).
[12] The majority opinion in Curtiss, was questioned in a subsequent decision of the Court of Appeals for the Second Circuit. See United States ex rel. Miller v. Follette, 397 F.2d 363 (1968). In any event, as will be noted more fully infra, the facts here are clearly distinguishable. Unlike defendant in Curtiss, defendant in this case made repeated references in his unsworn statement to his failure to take the stand.
[13] At the post-conviction relief hearing defendant's trial counsel testified that he discussed the possibility of Bontempo giving an unsworn statement to the jury, but that he never gave any specific advice in that regard. Defense counsel's discussions with defendant pertained primarily to the question whether Bontempo was to testify. The principal reasons militating against taking the stand were the fear of cross-examination and the jury being apprised of defendant's criminal record. It was hardly irrational for defendant to decide that an unsworn statement to the jury without the possibility of cross-examination was much the preferred course. While defense counsel testified that he harbored hidden inner thoughts against Bontempo giving such a statement, his comments on the record do not support that claim.
[14] It will be recalled that defendant had ingested large quantities of tranquilizers immediately prior to his apprehension. Defendant's relatives testified at the post-conviction relief hearing that Bontempo's mental condition deteriorated following that incident. Additionally, defendant presented evidence indicating that he suffered from epilepsy and that he was taking prescribed dosages of phenobarbital and dilantin at the time of the trial. Defendant also complained of intense headaches during his confinement both prior to and during trial. Prescribed dosages of librium and aspirin were given.

There is no question that defendant was upset and concerned during his trial. Nonetheless, the record does not support defendant's claim that his mental faculties were so impaired as to preclude him from voluntarily and intelligently waiving his Fifth Amendment privilege. There is nothing to indicate that defendant was affected to his detriment by his voluntary ingestion of medication prior to and during trial. The drugs he received, at his own behest, did not prevent him from receiving a fair trial. Cf. State v. Trantino, 60 N.J. 176, 182 (1972); United States ex rel. Trantino v. Hatrak, 408 F. Supp. 476, 486 (D.N.J. 1976), aff'd 563 F.2d 86, 92 (3 Cir.1977).
[15] It should be noted that under the new Code of Criminal Justice, effective September 1, 1979, one cannot be convicted for both the Substantive crime and conspiracy; N.J.S.A. 2C:1-8a(2). See possible applicability of N.J.S.A. 2C:1-1(d)(2).