**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3045-20

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

MARKITA A. NORRIS, a/k/a
MARKITA ANITA NORRIS,
MAKITA A. NORRIS, and
MONROE ZYIRE QURAN NORRIS,

    Defendant-Appellant.

_____

Submitted December 11, 2023 – Decided December 22, 2023

Before Judges Sabatino, Marczyk, and Chase.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 10-07-0774.

Joseph E. Krakora, Public Defender, attorney for appellant (Andrew Robert Burroughs, Designated Counsel, on the briefs).

William A. Daniel, Union County Prosecutor, attorney for respondent (Michele C. Buckley, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Markita Norris appeals from a February 25, 2021 order denying both her petition for post-conviction relief ("PCR") and motion for a new trial. We affirm substantially for the reasons set forth by Judge Regina Caulfield in her well-reasoned ninety-six-page written opinion.

I.

We incorporate the facts leading to defendant's May 30, 2012 convictions from our decision on defendant's direct appeal, State v. Norris, No. A-1561-12, (App. Div. Nov. 30, 2015), 2ertify. denied, 226 N.J. 213 (2016), where we previously affirmed defendant's conviction but remanded for resentencing, and State v. Norris, No. A-3008-15, (App. Div. May 15, 2017), where we again remanded for resentencing. The facts underlying defendant's conviction are detailed in our previous opinions and need not be repeated in their entirety. Rather, we recount the facts relevant to defendant's petition and motion.

The State established at trial that in March 2010, during a fundraiser at the Black United Fund in Plainfield, the victims were dancing when defendant "bumped shoulders" with decedent. When the parties saw each other outside, defendant and her uncle instigated another verbal altercation with the surviving

victim and decedent. The verbal altercation became physical when defendant's uncle punched the surviving victim.

At trial, the State called five eyewitnesses who saw defendant attack the victims during the fight. Four of the eyewitnesses' testimony collectively established that defendant was the only one who fought with and stabbed the decedent, who collapsed on the sidewalk. The testimony of these witnesses also established that while defendant's uncle fought with the surviving victim, defendant stabbed the surviving victim twice in the left arm and once in the back. The surviving victim suffered a collapsed lung and other injuries. Defendant then went back and kicked the decedent in the head before leaving in her uncle's car.

The fifth and final eyewitness, Mahalia Frieda Fowler-Stewart, testified she saw decedent prior to the fight standing by a tree when defendant "just swung on him, hit him in his stomach." She watched them fight for "a minute and then he just fell, and the tree came out of the ground." Fowler-Stewart ran over to decedent and saw that he had a stab wound in his chest. Fowler-Stewart also saw defendant kick decedent after he fell to the ground. She testified defendant then went over to the surviving victim and "hit him in the back." The surviving victim then walked to a wall, called to Fowler-Stewart, and said, "I

3

think she stabbed me." Fowler-Stewart testified that she attempted to help the decedent by holding him in her arms. The decedent spoke to her and said, "why she stab me? [P]lease don't let me die." Decedent repeatedly said he could not breathe. Fowler-Stewart testified that the paramedics arrived and put decedent in an ambulance.

The surviving victim also testified about the initial bump, the beginning of the fight, and his fight with defendant's uncle. He testified that at some point during the fight he began to "feel weak and didn't know why." He saw defendant dance in the middle of the street before she and her uncle drove away in his car.

Plainfield Police Officer Candis Grant testified that she responded to the scene before the victims were taken to the hospital. An individual in the crowd yelled to her and pointed in the direction of defendant's uncle's car. Officer Grant attempted to stop the car; however, she failed, and a pursuit ensued. During the five-minute pursuit, Officer Grant observed a handgun thrown out of the passenger window of the vehicle. When the vehicle finally stopped, defendant and her uncle were arrested. Defendant had $234 in cash on her, and the police found thirty-four bags of cocaine in the backseat of the patrol car where defendant had been sitting. At trial, the parties stipulated that the gun

thrown from the car belonged to defendant's uncle, and he pled guilty to possessing it. Defendant did not testify.

On May 30, 2012, the jury found defendant guilty of murder, N.J.S.A. 2C:11-3a(1); attempted murder, N.J.S.A. 2C:5-1 and N.J.S.A. 2C:11-3; possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d); possession of a controlled dangerous substance ("CDS"), N.J.S.A. 2C:35-10a (1); possession of CDS with intent to distribute, N.J.S.A. 2C:35-5(a)(1); possession of CDS with intent to distribute within 1,000 feet of school property, N.J.S.A. 2C:35-7; and unlawful possession of a weapon, N.J.S.A. 2C:39-5(d).

Initially, defendant's convictions were affirmed, but her eighty-year sentence was remanded for resentencing. She then appealed her second sentence, which was also remanded. Defendant was eventually sentenced to forty years of incarceration and a consecutive fifteen-year term of incarceration, both subject to the No Early Release Act, N.J.S.A. 2C:43-7.2 with an additional five-year term to run concurrently for possession of CDS with the intent to distribute within 1,000 feet of a school.

II.

In March 2019, defendant filed a petition for PCR and a motion for new trial. Defendant argued she was entitled to post-conviction relief due to several

errors committed by her trial attorney constituting ineffective assistance of counsel, and she was entitled to a new trial due to the fabricated testimony provided by Fowler-Stewart.

First, in regard to her PCR, defendant alleged her counsel was ineffective for allowing the State to present evidence related to her uncle's guilty plea to possession of a handgun; for failing to make a pretrial motion to sever the unrelated drug counts into separate trials; for allowing the admission of certain hearsay statements in violation of the evidentiary rules and her right to confrontation; and for failing to properly investigate and cross-examine a witness with respect to their claim that an unknown male was involved in the altercation. Defendant further contended the cumulative errors established her claim of ineffective assistance of counsel. As these arguments were decided on direct appeal, the court declined to revisit them.

Regarding the motion for a new trial, the court heard testimony from November 2019 to February 2020. First, the court heard the testimony of Shohin Ghaffari, a family friend of defendant. Ghaffari testified defendant was a "friend of the family" and was his "fiancé's cousin." Ghaffari did not believe defendant committed the alleged offenses, and he began conducting his own investigation. Ghaffari spoke to ten people as part of his investigation, but only Fowler-Stewart

was cooperative. Ghaffari decided to take further action after Fowler-Stewart "broke out and started crying in tears" when asked about defendant's case. Ghaffari brought Fowler-Stewart to PCR counsel's office on two occasions. He denied making any threats or promises to Fowler-Stewart in exchange for meeting with PCR counsel. Ghaffari explained, to his understanding, Fowler-Stewart met with PCR counsel freely and voluntarily. Ghaffari had no training in the practice of law, legal research, law enforcement, security, or investigations.

The trial court determined Ghaffari was not a credible witness due to his inability to recall key information, his refusal to provide names of individuals from whom he obtained information regarding defendant's innocence, and his noted recollection of only information he felt was important to the case. The court also noted Ghaffari's body language and hesitation when answering certain questions posed by the State. Further, the court found Ghaffari was "often inconsistent and non-responsive, was often evasive and, at other times defensive, and insisted he could not recall certain information when pressed . . . ." The court ultimately rejected Ghaffari's testimony as being mostly untrue, particularly as it related to his conversations with Fowler-Stewart and his contact with certain alleged witnesses during his investigation.

A-3045-20

Following Ghaffari, Fowler-Stewart testified intermittently before the PCR court over several months. Fowler-Stewart testified that upon meeting with Ghaffari, she confessed she fabricated decedent's dying declaration. Fowler-Stewart explained when she ran over to decedent as he was lying bleeding on the ground, he had not made the declaration to her. When asked why she previously lied about the statement, Fowler-Stewart said she felt compelled to do so due to a detective on the case harassing her and threatening to remove her from Recovery Court if she did not testify. Fowler-Stewart thought she should "tell them what they wanted to hear." Fowler-Stewart denied seeing defendant swing at decedent's stomach, and insisted she did not see anything besides defendant kick decedent and swing towards the surviving witness.

The court compared Fowler-Stewart's statements, demeanor, and behavior when she originally gave statements to police to her testimony at trial where she recanted her testimony. When giving statements to police following the incident, the court found Fowler-Stewart to be clear, consistent, alert, responsive, focused, and cooperative. The court noted Fowler-Stewart was polite and respectful to the officers and, without being asked to do so, demonstrated defendant's motions towards both victims during the fight. In considering Fowler-Stewart's behavior at trial, after both reading the transcript

8

and listening to the same testimony, the court found it easy to understand why the jury found Fowler-Stewart believable. The court found Fowler-Stewart's trial testimony completely credible, cooperative, responsive, and consistent in providing her answers.

The court found fowle—Stewart's demeanor took a noticeable turn during the motion for new trial. The court determined Fowler-Stewart's testimony to be not credible, as Fowler-Stewart gave no basis for her previous statements being forced on her by police officers. The court noted her repeated inconsistencies, that she contradicted herself during the hearing, and displayed abrupt behavior, indicating a lack of truthfulness.

The court held the trial testimony recanted by Fowler-Stewart to be material; however, the court reasoned defendant's recantation "must be placed in context with the trial evidence" and considered alongside the State's solid circumstantial case against defendant for both stabbings. The court noted that had Fowler-Stewart not testified, the court and jury would have been able to compile the remaining witnesses' testimonies to determine it was defendant who was in the altercation with decedent and likely the assailant, as no other testimony identified another person fighting during the altercation. Additionally, even without Fowler-Stewart's testimony, if defendant was

9

granted a new trial with the other witnesses presenting the same testimony as they did in 2012, defendant would likely be convicted. The court opined defendant's presentation of Fowler-Stewart's recantation as "new evidence" in her motion for new trial was "completely incredible." According to the court, the recantation did not cast serious doubt upon the truth of the testimony that Fowler-Stewart gave at trial.

On February 25, 2021, the court denied defendant's motion for a new trial and denied the PCR petition without an evidentiary hearing. This appeal followed.

## III.

On appeal, defendant raises the following issues for our consideration:

> POINT I
>
> AS DEFENDANT HAD SHOWN THAT SHE RECEIVED PREJUDICIAL INEFFECTIVE . . . ASSSISTANCE OF PCR COUNSEL, THE PCR COURT ERRED BY DENYING HER PCR PETITION WITHOUT AN EVIDENTIARY HEARING
>
> > (1) Defendant was prejudiced when trial counsel failed to object to the introduction of evidence that co-defendant Malcolm Hunter entered a guilty plea to unlawful possession of a handgun.
> >
> > (2) Trial counsel was ineffective by failing to move to sever the drug charges.

10

(3) Trial counsel's cumulative errors denied defendant effective legal representation.

(4) As there were genuine issues of material facts in dispute, an evidentiary hearing was required.

POINT II

AS DEFENDANT HAS SHOWN THAT THE INTERESTS OF JUSTICE WARRANT A NEW TRIAL, THE PCR COURT ERRED WHEN IT DENIED DEFENDANT'S MOTION FOR A NEW TRIAL.

We discern no abuse of discretion in the judge's decision to deny both the PCR petition without an evidentiary hearing and the motion for a new trial. We add the following comments.

A.

When petitioning for PCR, the defendant must establish, by a preponderance of the credible evidence, that she is entitled to the requested relief. State v. Nash, 212 N.J. 518, 541 (2013); State v. Preciose, 129 N.J. 451, 459 (1992). To establish a prima facie claim of ineffective assistance of counsel, the defendant is obligated to show not only the particular way counsel's performance was deficient, but also that the deficiency prejudiced her right to a fair trial. Strickland v. Washington, 466 U.S. 668, 687 (1984); State v. Fritz,

105 N.J. 42, 58 (1987). We review a judge's decision to deny a PCR petition without an evidentiary hearing for abuse of discretion. Preciose, 129 N.J. at 462.

Collectively, Rules 3:22-4(a) and 3:22-5 provide procedural bars such that "a defendant may not employ PCR to assert a new claim that could have been raised on direct appeal, . . . or to relitigate a claim already decided on the merits." State v. Goodwin, 173 N.J. 583, 593 (2002) (citing respectively R. 3:22-4 and -5). Under Rule 3:22-5, "[p]reclusion of consideration of an argument presented in PCR proceedings should be effected only if the issue raised is identical or substantially equivalent to that adjudicated previously on direct appeal." State v. Marshall, 148 N.J. 89, 150 (1997) (quoting State v. Bontempo, 170 N.J. Super. 220, 234 (App. Div. 1979)).

Defendant raised the following issues in her direct appeal: 1) her uncle's plea to possession of the handgun should not have been admitted at her trial; 2) trial counsel's agreement to stipulate to this information amounted to ineffective assistance of counsel; and 3) trial counsel was ineffective for failing to move for severance of drug charges that were unrelated to the murder and attempt charges. The trial court did not abuse its discretion in holding defendant was not entitled to re-argue the same issues at her PCR hearing as she had in her direct appeal.

Since none of the individual actions of defendant's trial attorney had been deemed improper or ineffective, but rather strategic, the cumulative effect of such alleged actions would not be improper.

B.

"[Appellate courts] review a motion for a new trial decision for an abuse of discretion," State v. Fortin, 464 N.J. Super. 193, 216 (App. Div. 2020) (citing State v. Armour, 446 N.J. Super. 295, 306 (App. Div. 2016)), and will not interfere with the decision "unless a clear abuse has been shown." State v. Russo, 333 N.J. Super. 119, 137 (App. Div. 2000) (State v. Artis, 36 N.J. 538, 541 (1962)). "[Appellate courts] must keep in mind that the purpose of post-conviction review in light of newly discovered evidence is to provide a safeguard in the system for those who are unjustly convicted of a crime." State v. Ways, 180 N.J. 171, 188 (2004). "Newly discovered evidence must be reviewed with a certain degree of circumspection to ensure that it is not the product of fabrication, and, if credible and material, is of sufficient weight that it would probably alter the outcome of the verdict in a new trial." Id. at 187-88.

Appellate courts apply a deferential standard in reviewing factual findings by a judge. Balducci v. Cige, 240 N.J. 574, 595 (2020); State v. McNeil-Thomas, 238 N.J. 256, 271 (2019). In an appeal from a non-jury trial, appellate

courts "give deference to the trial court that heard the witnesses, sifted the competing evidence, and made reasoned conclusions." Griepenburg v. Twp. of Ocean, 220 N.J. 239, 254 (2015). "Appellate courts owe deference to the trial court's credibility determinations as well because it has 'a better perspective than a reviewing court €n evaluating the veracity of a witness.'" C.R. v. M.T., 248 N.J. 428, 440 (2021) (quoting Gnall v. Gnall, 222 N.J. 414, 428 (2015) (quoting Cesare v. Cesare, 154 N.J. 394, 412 (1998))).

The court denied defendant's motion for new trial based on its determination that Fowler-Stewart's testimony at the hearing was not credible and would not set aside the jury's sound verdict if presented at trial. The court further found that even if Fowler-Stewart had not testified, the court and jury would have been able to compile the remaining witnesses' testimonies to identify defendant in the altercation with decedent and that she was likely the person responsible for his murder. The court thus reasonably concluded defendant would likely still be convicted at a new trial. Thus, defendant failed to meet her burden to warrant the granting of her motion. In adhering to the deferential standard of review for a court's factual findings on its review of live witness testimony, there is no reason to deviate from the court's denial of defendant's motion for new trial.

Defendant's remaining arguments are without sufficient merit to warrant further discussion.  R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

15